IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
April 4, 2001 Session

## STATE OF TENNESSEE v. JOHN MICHAEL BANE

**Automatic Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 89-01502     John P. Colton, Jr., Judge**

---

**No. W1997-02158-SC-DDT-DD - Filed July 3, 2001**

---

The defendant, John Michael Bane, was convicted of felony murder in the perpetration of a robbery for an offense committed in November of 1988. The jury originally imposed a sentence of death after it found that evidence of two aggravating circumstances – (1) the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind and (2) the murder was committed during the perpetration of a felony – outweighed evidence of any mitigating factors. See Tenn. Code Ann. § 39-2-203(i)(5), (7) (1982). On appeal, this Court affirmed the conviction, but remanded for a new sentencing hearing because the jury's application of the felony murder aggravating circumstance duplicated the offense of felony murder in violation of article I, section 16 of the Tennessee Constitution. See State v. Bane, 853 S.W.2d 483 (Tenn. 1993). After a new sentencing hearing, the jury again imposed a sentence of death after it found that evidence of two aggravating circumstances – (1) the murder was "especially atrocious or cruel in that it involved torture and depravity of mind" and (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another – outweighed evidence of any mitigating factors. See Tenn. Code Ann. § 39-2-203(i)(5), (6) (1982).

After the Court of Criminal Appeals affirmed the death sentence, the case was docketed in this Court. See Tenn. Code Ann. § 39-13-206(a) (1997) ("The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court."). After reviewing the record, the briefs, and applicable authority, we designated seven issues for oral argument.[1] We now hold as follows: (1) the trial court did not err in refusing to instruct the jury that a witness for the prosecution, Brian Lovett, was an accomplice whose testimony had to be corroborated in order to find an aggravating circumstance; (2) the trial court did not err in refusing to admit Bryan Lovett's medical and psychological records; (3) the trial court did not err in refusing to allow the defendant's expert witness to remain in the courtroom; (4) the trial court did not err in allowing the prosecution to argue a "non-statutory" aggravating circumstance; (5) the evidence was

---

[1]     "Prior to the setting of oral argument, the Court shall review the records and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

sufficient to support the jury's application of the aggravating circumstance set forth in Tenn. Code Ann. § 39-2-203(i)(5) (1982); (6) the evidence was sufficient to support the jury's application of the aggravating circumstance set forth in Tenn. Code Ann. § 39-2-203(i)(6) (1982); and (7) the sentence of death was not arbitrary or disproportionate as applied in this case to the defendant. We also agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, C.J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., dissenting.

Joseph S. Ozment, Memphis, Tennessee, and Charles S. Kelly, Dyersburg, Tennessee, for the appellant, John Michael Bane.

Michael E. Moore, Solicitor General; Amy L. Tarkington, Deputy Attorney General; William L. Gibbons, District Attorney General; and Thomas D. Henderson and Kevin R. Rardin, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

On November 19, 1988, police found the body of the victim, Royce D. Frazier, age 60, lying in a bathtub full of water in his home near Memphis, Tennessee. Frazier had been gagged; a plastic bag had been placed over his head; and an electrical cord was tied around his neck. A plunger had been placed over his face apparently to keep his head submerged. Frazier's house had been ransacked: several lamps and ashtrays had been overturned and numerous items were scattered in disarray.

Brian Lovett, who was 16 at the time of the offense, testified that his mother, Donna Lovett, and the defendant, John Michael Bane, had discussed a plan to rob the victim several days before he was killed. The plan was for Donna Lovett to visit Frazier, whom she knew, and render him unconscious by putting Visine eye drops in his beer. Bane would then enter Frazier's home and carry out the robbery with Donna Lovett. According to Brian Lovett, Bane said that Frazier would have to be killed because he "knew [Lovett] and would tell on her." Brian Lovett said that he and Bane discussed choking or stabbing the victim.

On the day after the robbery plan discussion, Donna Lovett and the defendant Bane experimented by giving Brian Lovett a beer containing eye drops to see whether it would render him

unconscious. Brian Lovett testified that it caused him to fall asleep within five minutes of drinking the beer. Thomas Lovett, Brian's younger brother, also testified that he recalled Brian drinking a beer containing eye drops.

Sometime in the late afternoon of November 17, 1988, Bane, accompanied by Donna Lovett and her two sons, Brian and Thomas Lovett, drove his car past Frazier's home several times, but no one appeared to be home. Bane explained that he was going to borrow money from the occupant. When they saw Frazier's car at the home, Donna Lovett got out of the car and went into the house alone. Bane then left and drove Brian and Thomas to Brian's girlfriend's home. A short time later, Bane picked up the boys and took them to the Lovetts' trailer in Ripley, Tennessee. Thereafter, Bane, along with Brian Lovett, returned to Frazier's home. When Donna Lovett signaled by "flickering" the porch light on two occasions, Bane entered Frazier's home, leaving Brian Lovett in the car.

According to Brian Lovett's testimony, approximately thirty minutes later Bane and Donna Lovett ran to the car carrying several items of Frazier's property. Bane had blood on his gloves and Donna Lovett was crying and upset. While driving from the scene, Bane told Brian that he had beaten the victim several times because he kept getting up and that he had "cut [the victim's] nuts off." Bane also said that he had taken $726 and that he "had done such a good job he deserved a beer." Bane was arrested two days later when Donna Lovett reported the events of November 17, 1988 to the police.[2]

Brian Lovett testified that his sister committed suicide several months before the killing of the victim and that he himself had attempted suicide on two occasions before November 17, 1988. He admitted that he had been treated at Charter Lakeside and Memphis Mental Health Institute and that he had a history of using cocaine, speed, marijuana, and alcohol. Lovett also admitted that he had made conflicting statements about the murder. In one statement, he had told authorities that he had looked in Frazier's window and saw Bane holding a knife to the victim's groin while Donna Lovett placed a bag over the victim's head. He did not recall why he had made the statement and conceded that he had never left Bane's car. Lovett testified that he had been arrested for theft after Bane was convicted and that he had been placed in the same prison cell as the defendant. He conceded that he signed a statement that he had lied at trial because he feared the defendant.

Dr. Jerry Francisco, Shelby Counter Medical Examiner, testified that the cause of the victim's death was ligature strangulation with asphyxia. The combination of the cloth gag, plastic bag, and electrical cord had cut off the supply of blood to the victim's brain and the supply of oxygen to his lungs. The victim's tongue had been pushed into the back of his mouth from the cloth gag. Dr. Francisco stated that the victim could have been rendered unconscious in seconds or minutes, depending on the severity and force of the ligature strangulation, but that the victim's death required several minutes. Dr. Francisco testified that the victim had extensive bruising around his eyes, head, neck, arms, and hip; a tear and scrape below his left eye; and abrasions around his neck. There was

---

[2] The evidence indicated that Donna Lovett reported the events to authorities after she learned that the defendant was at a motel with another woman on the day after the offense.

-3-

no evidence of injury to the victim's groin area or scrotum. Dr. Francisco testified that fluid found in the victim's lungs was consistent with a finding that the victim had been alive when placed in the water.

The defendant Bane called several witnesses to testify on his behalf. Brian Lovett identified the handwriting of Donna Lovett in two letters that she had written to Bane after the murder. One of the letters indicated that Brian Lovett had lied at trial and was coerced by the prosecution. Donna Lovett also wrote that only she and Bane knew what happened in Frazier's home.

Wilma McNeill, the defendant's aunt, testified that Bane had been "very close" to his mother, who died of cancer in April of 1988. McNeill testified that Bane had grown up working on a farm. She stated that she loved Bane and asked the jury to spare his life. Maybelle Cunningham, also an aunt of the defendant, testified that both of Bane's parents were deceased. Cunningham testified that Bane had two sons, ages 14 and 10.

Marvin Ramey testified that Bane had worked on his farm when he was young and was a good worker. Ramey testified that his wife looked after Bane and that he had never caused any trouble.

Teresa Goforth, a co-worker of Bane and Donna Lovett at J.P.W. Enterprises, testified that Bane was a good, hard worker. She testified that Bane and Donna Lovett were dating and that Lovett was extremely jealous. About one week before the murder, Donna Lovett told Goforth that "if she couldn't have [the defendant], no one would and that she would see him locked away so far he would never get out."

Alicia Shadell Gray, Bane's cousin, likewise testified that Donna Lovett was very possessive and jealous. Three weeks before the murder, Gray heard Lovett say, "If I can't have Michael, no woman would have Michael, and I'll see us both behind bars." Donna Lovett attempted suicide later that day at Gray's home by overdosing on pills, and Bane took her to the emergency room. Gray testified that after Bane was convicted, Brian Lovett told her that his mother had agreed to plead guilty in exchange for a sentence of 35 years and that he did not want to see "an innocent man" go to prison. He said he planned to write an affidavit stating that Bane had no part in the offense.

Diane Bane testified that she met Bane while he was in prison and fell in love with him after talking regularly to him on the telephone. She married Bane in March of 1995 and travels 200 miles round trip every Saturday to visit him. Her former husband died in August of 1994, and she had three sons from that marriage.

After deliberating on all of the above evidence, the jury found that there was evidence supporting two aggravating circumstances: (1) that the murder was "especially atrocious or cruel in

-4-

that it involved torture and depravity of mind"[3] and (2) that the murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-2-203(i)(5), (6) (1982).[4] After further finding that the aggravating circumstances outweighed the evidence of mitigating circumstances, the jury imposed a sentence of death.

## ANALYSIS

### Corroboration of Accomplice Testimony

The defendant argues that the trial court erred in failing to instruct the jury that Brian Lovett was an accomplice to the offense and that an aggravating circumstance cannot be predicated upon the uncorroborated testimony of an accomplice. The State maintains that corroboration of an accomplice's testimony is not required for sentencing; that the trial court did not err in refusing to instruct the jury that corroboration was required as a non-statutory mitigating circumstance; and that, in any event, Brian Lovett's testimony was corroborated by the testimony of his younger brother, Thomas Lovett.

This Court has repeatedly held that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense. See State v. Stout, ___ S.W.3d ___ (Tenn. 2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964). We have described the nature of this requirement as follows:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

---

[3] As will be discussed herein, the jury's verdict did not track the specific language of Tenn. Code Ann. § 39-2-203(i)(5) (1982).

[4] Although all of the capital sentencing provisions were amended and recodified in 1989, the jury in this case was properly instructed with the law as it existed at the time of the offense. See State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994). The aggravating circumstances at issue in this case are now codified in Tenn. Code Ann. § 39-13-204(i)(5), (6) (1997 & Supp. 2000).

State v. Bigbee, 885 S.W.2d at 803 (quoting Hawkins v. State, 469 S.W.2d 515, 520 (Tenn. Crim. App. 1971) (citations omitted)) (emphasis added). As the State correctly argues, this Court has never extended the corroboration requirement to an accomplice testifying in the sentencing phase of a capital trial. See State v. Henley, 774 S.W. 908, 913 (Tenn. 1989) (conviction may not be based on accomplice's testimony unless there is some corroboration).

There is likewise no statutory provision that requires corroboration of an accomplice's testimony for the finding of an aggravating circumstance in the sentencing phase of a capital trial. Instead, at the time of this offense, the statute governing the admissibility of evidence in the sentencing phase of a capital trial provided as follows:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstances of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i) below; and any evidence tending to establish or rebut any mitigating factors. Any such evidence which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the state of Tennessee.

Tenn. Code Ann. § 39-2-203(c) (1982). The statute obviously contains no express provision regarding the corroboration of accomplice testimony and instead affords the trial court wide discretion in ruling upon the admissibility of evidence. See State v. Sims, ___ S.W.3d ___ (Tenn. 2001) (discussing trial court's broad discretion under the identical provisions of Tenn. Code Ann. § 39-13-204(c) (1997)).

In addition to the absence of case law or statutory authority, we likewise find no other basis or rationale for applying the corroboration requirement in a capital sentencing proceeding. The purpose of the corroboration requirement is to assure that a conviction is not predicated solely upon the testimony of a witness who was also involved in the commission of the offense. See Bigbee, 885 S.W.2d at 803. In a capital sentencing proceeding, the defendant has already been convicted of the offense and the testimony of any accomplice has been subject to the corroboration requirement during the guilt phase of the trial.[5] See People v. Hamilton, 259 Cal. Rptr. 701, 774 P.2d 730, 752 (1989).

---

[5] For example, although the present case involved only re-sentencing, it appears that the trial court instructed the jury that Brian Lovett was an accomplice during the guilt phase of the trial.

Moreover, the capital sentencing scheme as a whole contains numerous specific provisions to ensure a high degree of reliability in deciding whether a death sentence is appropriate. The jury is required to find, for example, that any aggravating circumstance has been proven by the prosecution beyond a reasonable doubt and that the evidence of the aggravating circumstances outweighed evidence of mitigating factors. Tenn. Code Ann. § 39-2-203(g) (1982).[6] The jury's consideration of mitigating factors may include "any aspect of a defendant's character or record or any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." State v. Stout, ___ S.W.3d at ___ (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S. Ct. 2954, 2964, 57 L. Ed. 2d 973 (1978)). Finally, every sentence of death must also be carefully scrutinized on appeal to determine whether the jury's findings are supported by the evidence and whether the sentence of death is arbitrary, excessive, or disproportionate to sentences imposed in other cases. See Tenn. Code Ann. § 39-2-205(c) (1982).[7] In light of these specific statutory provisions governing capital sentencing, we conclude that there is no basis or rationale for applying the corroboration requirement to the sentencing phase of a capital trial.

In a related issue, we agree with the Court of Criminal Appeals' conclusion that the trial court did not err in failing to charge accomplice corroboration as part of any "non-statutory mitigating factors" requested by the defendant. The defendant had requested two special instructions that stated, in part, that Brian Lovett was an accomplice; that he lacked credibility due to his inconsistent statements and testimony; and that he was not charged or convicted for his role in the offense.

Under statutory law at the time of this offense, however, a trial court was not required to instruct the jury on non-statutory mitigating factors. See State v. Hartman, 703 S.W.2d 106, 118 (Tenn. 1985). Although a 1989 statutory amendment requires instructions on non-statutory mitigating factors that are supported by the evidence, it is not applicable to offenses committed before the effective date of the amendment. See State v. Smith, 993 S.W.2d 6, 32 (Tenn. 1999). In any event, the evidence of Brian Lovett's involvement in the offense and his inconsistent statements was heard by the jury. The defense vigorously argued that the evidence impeached the witness and cast doubt on Bane's involvement in the murder. Therefore, even if a specific instruction had been appropriate, its absence did not affect the outcome to the prejudice of the defendant.

### Psychological and Medical Records

The defendant argues that the trial court erred in refusing to admit records regarding Brian Lovett's medical and psychological treatment for the purpose of impeaching the witness and raising "residual doubt" as to the defendant's role in the offense. The State counters that the defense was allowed to inquire extensively into Brian Lovett's medical and psychological background and that the trial court did not abuse its discretion in refusing to admit the underlying medical records.

---

[6] The present version of this statute requires that the jury conclude that the evidence of aggravating circumstances outweighs evidence of mitigating factors beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(g) (1997 & Supp. 2000).

[7] Presently codified at Tenn. Code Ann. § 39-13-206(c) (1997).

-7-

The defendant relies in part upon Tenn. R. Evid. 617, which provides that a "party may offer evidence that a witness suffered from impaired capacity at the time of an occurrence or testimony." As we discussed above, however, the admissibility of evidence in a capital sentencing proceeding is largely governed by a statute that "should be interpreted to allow trial judges wider discretion than would normally be allowed under the Tennessee Rules of Evidence . . . ." State v. Sims, ___ S.W.3d at ___.[8] We also observed in Sims:

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

Id. at ___ (emphasis added).

The defendant also correctly asserts that a defendant is permitted to present evidence of "residual doubt" as a non-statutory mitigating factor in a re-sentencing proceeding. State v. Teague, 897 S.W.2d 248, 256 (Tenn. 1995). We recently have explained:

> By definition, residual doubt is established by proof that casts doubt on the defendant's guilt. It is not limited to proof that mitigates the defendant's culpability for the crimes.
>
> While we agree . . . that not all impeachment proof will be relevant to show residual doubt, it does not logically follow that impeachment proof will never be relevant to establish residual doubt about the defendant's guilt. Where . . . the proffered residual doubt is impeachment of the testimony of the only witness who offered direct rather than circumstantial proof of the defendant's involvement in the

---

[8] Although Sims discussed the present statute governing admissibility of evidence, see Tenn Code Ann. § 39-13-204(c) (1997), our comments are equally applicable to the statute in effect at the time of the defendant's offense, *i.e.*, Tenn. Code Ann. § 39-2-203(c) (1982).

> crime, such proof clearly is relevant and admissible to establish
> residual doubt as a mitigating circumstance.

State v. Hartman, ___ S.W.3d ___, ___ (Tenn. 2001).

With these principles in mind, the defendant argued that he wanted to use the records to show that Brian Lovett had a history of mental health problems; that he had been discharged from treatment against medical advice shortly before the offense; and that his capacity to recall and relate facts was impaired. Moreover, the defendant argued that because Brian Lovett was the main witness against him, the impeachment evidence necessarily raised doubt as to the defendant's role in the offense.

The record reveals that the trial court gave careful consideration to this issue. The court conducted several jury-out hearings on the issue and did not foreclose any efforts made by the defendant to question the witness with regard to his history of suicide attempts, mental health treatment, and drug abuse. The trial court even signed an order allowing the defense to obtain certain medical and psychological records. During the sentencing, Brian Lovett testified about his two suicide attempts, one of which occurred one month before the offense, and he testified that he had been treated in two mental health facilities. He testified that his sister had committed suicide several months before the murder. Finally, Lovett admitted his history of using marijuana, cocaine, alcohol, and speed. When denying the motion for a new trial on this issue, the trial court made the following findings:

> Defense counsel asked Bryan [sic] Lovett about the information in the
> records and the witness admitted everything. Thus, the jury heard the
> evidence from the witness himself, there was nothing to impeach, and
> the defense was free to argue Bryan [sic] Lovett's credibility to the
> jury in closing argument.

Moreover, as the Court of Criminal Appeals observed, the evidence failed to show that the witness's alleged impaired capacity existed at the time of the offense or at the time of the witness's testimony. See Tenn. R. Evid. 617.

Accordingly, we conclude that the defendant was not denied an opportunity to use evidence of Brian Lovett's medical and psychological history for the purpose of impeaching the witness's testimony or raising any doubts about the defendant's role in the offense. In short, the trial court did not abuse its discretion in ruling that the mental and psychological records were cumulative to the testimony and therefore inadmissible.

**Sequestration of Defense Expert Witness**

The defendant contends that the trial court committed reversible error and violated his rights to due process and confrontation by refusing to exempt the defendant's expert witness, a pathologist, from the rule of witness sequestration. The defendant specifically argues that the presence of his expert witness in the courtroom was essential for the purpose of responding to and rebutting the testimony of the Shelby County Medical Examiner. The State responds that the trial court did not abuse its discretion and that, in any event, the defendant has failed to demonstrate how he was prejudiced by the trial court's ruling.

The defendant relies in part upon Tenn. R. Evid. 615, which provides that "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing." The rule also provides, however, that it does not authorize the exclusion of "a person whose presence is shown by a party to be essential to the presentation of the party's cause." Tenn. R. Evid. 615. The comments to the rule suggest that an essential witness may be "an expert witness a lawyer needs to help the lawyer understand opposing testimony." See Tenn. R. Evid. 615 (advisory commission comments). The purpose of the rule, simply put, is to prevent a witness from changing or altering his or her testimony based on testimony heard or facts learned from other testifying witnesses. See State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992).

As the defendant points out, we recently said that Rule 615 is not applicable in a proceeding to determine whether a defendant is competent to be executed. Coe v. State, 17 S.W.3d 193, 222 (Tenn. 2000). In ruling that mental health experts were permitted to remain in the courtroom despite the general rule of witness sequestration, we focused on the unique nature of such a competency proceeding:

> Allowing the mental health experts to remain in the courtroom during the presentation of the proof is entirely consistent with the purpose of competency proceedings which is to accurately ascertain the prisoner's mental state. . . . Also, the dangers Rule 615 is intended to prevent do not arise in a proceeding to determine competency to be executed. In light of the fact that both the State and the prisoner have access to the reports of the experts prior to the hearing, there is little or no risk that one of the expert witnesses will change his or her testimony or adopt facts testified to by other witnesses.

Id. at 222-23 (emphasis added).

Although Coe involved a mental competency proceeding, we believe that the dangers Rule 615 is intended to prevent generally do not arise with regard to expert witnesses in any proceeding. In fact, the rules of evidence provide that an expert witness may testify and base an opinion on evidence or facts made known to the expert at or before a hearing and the facts need not be admissible at trial. See Tenn. R. Evid. 703. Moreover, an expert witness often may need to hear the

substance of the testimony of other witnesses in order to formulate an opinion or respond to the opinions of other expert witnesses. In short, allowing an expert witness to remain in the courtroom as an "essential person" generally does not create the risk that the expert will alter or change factual testimony based on what is heard in the courtroom. Accordingly, we conclude that the trial court erred by refusing to allow the defendant's expert witness to remain in the courtroom without considering the purpose and application of Rule 615.

We must therefore determine whether the error affected the outcome of the proceedings to the defendant's prejudice. We observe first that the defendant and his expert pathologist had the benefit of the medical examiner's testimony from the initial trial. The defendant and his expert also had the benefit of the autopsy report and the findings with respect to the victim's injury and death. Moreover, there is no indication that the medical examiner's testimony was so detailed or complex as to be beyond the ability of defense counsel to comprehend and prepare a defense. Finally, the defendant did not call the expert to testify at the motion for new trial hearing or otherwise attempt to make an offer of proof as to how the evidence or cross-examination of the medical examiner would have differed had his expert witness been allowed to remain in the courtroom. Accordingly, for all of these reasons, we conclude that the trial court's refusal to allow the defendant's expert witness to remain in the courtroom did not affect the outcome to the prejudice of the defendant.

## Non-Statutory Aggravating Circumstances

The defendant argues that the prosecution was permitted to introduce and argue a non-statutory aggravating circumstance by referring to the defendant's relationships with women and his "promiscuity." The defendant's argument is based largely upon the prosecution's questioning of his aunt, Wilma McNeill, with regard to how many times the defendant had been married and the number of women with whom he had been involved in a relationship. McNeill replied that the defendant had been married twice, but that she did not know about his personal life. The State maintains that the evidence was proper to rebut evidence of mitigating factors presented by the defendant.

The defendant asserts that the prosecution may not argue that the jury impose a death sentence based on any factor that is not a statutory aggravating circumstance. See Cozzolino v. State, 584 S.W.2d 765, 768 (Tenn. 1979). As the State points out, however, the prosecution is permitted to rebut any mitigating factors relied on by a defendant. See Tenn. Code Ann. § 39-2-203(c) (1982); Terry v. State, 46 S.W.3d 147 (Tenn. 2001). In this case, the defendant introduced mitigating evidence of his family background, marriage, and two sons. The prosecution responded by detailing the defendant's relationships with several women. We agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in allowing the prosecution to rebut the

mitigating evidence in this manner.[9]  Moreover, there is no indication that the prosecution used the evidence as a non-statutory aggravating circumstance or otherwise argued that the jury was permitted to consider any non-statutory aggravating circumstance.

In a related argument, the defendant contends that the prosecution engaged in misconduct by calling him "sweetheart" several times during closing argument and by arguing that the defendant was seeing another woman despite having "moved in" with Donna Lovett.  The State contends that the prosecutor's closing argument was properly based on the evidence.

This Court has often observed that closing argument is a valuable privilege that should not be unduly restricted.  See State v. Bigbee, 885 S.W.2d at 809.  We have likewise recognized that the prosecutor may not engage in derogatory remarks or name calling.  State v. Bates, 804 S.W.2d 868, 881 (Tenn. 1991) (referring to defendant as a "rabid dog").  The trial court has wide discretion in controlling the course of arguments and will not be reversed absent an abuse of that discretion.  Moreover, prosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome to the prejudice of the defendant.  See Terry v. State, 46 S.W.3d at 156.

In reviewing the record, we agree with the Court of Criminal Appeals' conclusion that the prosecutor's closing arguments in this case were based on the evidence and were not designed to assert a non-statutory aggravating circumstance. To the contrary, it appears that the arguments were in response to the defendant's frequent attacks on the credibility of Brian Lovett.  The prosecutor argued, in part:

> Brian Lovett, whose sister committed suicide, who was not even in school, could not even live with his father, ended up living with his mother, Donna Lovett, and her 'sweetheart,' the defendant.  . . . Brian Lovett, because of the problems in his life, like a lot of young kids got involved with drugs.  After his sister's suicide, [he] checked himself into a hospital for help.  He . . . attempted to commit suicide by taking Tylenol, which may be a suicide attempt, it may just be a cry for help.  But he did it twice.  And he ended up trying to get help or maybe getting help because he did go to two mental institutions. . . .
>
> He returned safe to the bosom of his mother and her 'sweetheart' over here.  And they sit around and talk about robbing somebody.  His mother is talking with her 'sweetheart' who has moved in with her about robbing some old man.  So he joins in on the conversation. They practice their knockout drops on him.  His mother and his

---

[9]     We do observe, however, that the Court of Criminal Appeals incorrectly stated that the defendant "himself testified that he had been married twice and was dating two women at the same time."  The record reveals that the defendant did not testify at the re-sentencing.

mother's 'sweetheart' practice knockout drops on him?  Yeah, he's
got a real good start, hasn't he?

Accordingly, when viewed in context, there is no indication that the arguments were inflammatory or intended for the jury to impose the death penalty based on a non-statutory aggravating circumstance. Moreover, although the prosecution should refrain from engaging in any sort of personal name-calling, the arguments in no way affected the verdict to the prejudice of the defendant.

### Heinous, Atrocious, or Cruel Aggravating Circumstance

The defendant contends that the evidence was insufficient to support the jury's application of the "heinous, atrocious, or cruel" aggravating circumstance set forth in Tenn. Code Ann. § 39-2-203(i)(5) (1982). Specifically, the defendant argues that the prosecution failed to prove "torture and depravity of mind" because there was no evidence that the victim was alive when he was placed in the bathtub full of water. The State maintains that the evidence was sufficient to support the jury's application of this aggravating circumstance.

At the time of this offense, this aggravating circumstance provided that the "murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5) (1982). In State v. Williams, we explained that the terms of the (i)(5) aggravating circumstance must be given their plain and natural meaning as follows: "torture" means the infliction of severe physical or mental pain while the victim is alive and conscious; "heinous" means grossly wicked or reprehensible, abominable, odious, vile; "atrocious" means extremely evil or cruel, monstrous, exceptionally bad, abominable; "cruel" means disposed to inflict pain or suffering, causing suffering, painful; and "depravity of mind" means moral corruption, wicked or perverse act. 690 S.W.2d 517, 527-30 (Tenn. 1985). Moreover, we have repeatedly rejected the argument that this aggravating circumstance is vague, overly broad, or otherwise invalid. See Terry v. State, 46 S.W.3d at 160; State v. Strouth, 999 S.W.2d 759, 764 (Tenn. 1999); State v. Middlebrooks, 995 S.W.2d 550, 555-56 (Tenn. 1999).

We now address whether the evidence in this case was sufficient to support the jury's application of the aggravating circumstance. Our analysis requires that we determine whether, after viewing the evidence in a light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. Terry v. State, 46 S.W.3d at 160-61.

In this case, the evidence revealed that the defendant Bane planned the robbery of the victim along with Donna Lovett. The defendant repeatedly beat the 60-year-old victim, causing bruises and injuries to the victim's face, eyes, head, arms and hip, while the victim struggled for his life. The victim was forcibly gagged, displacing his tongue to the back of his mouth; a plastic bag was placed over his head and then tied around his neck with an electrical cord. The victim was then strangled,

cutting off the blood supply and air supply to his body. Although the medical examiner could not testify with complete certainty how long the victim may have remained conscious, it can be inferred from the proof of numerous blows, the victim's struggle, the gagging, the placing of a plastic bag over the victim's head, and the strangulation with the electrical cord that the ordeal lasted minutes and that unconsciousness was not instantaneous. Moreover, the medical examiner testified within a reasonable degree of certainty that the victim was still alive when placed in the bathtub full of water. This is likewise supported by the fact that a plunger had to be used to hold the victim's face and head underwater and by Lovett's testimony that the defendant stated he had beaten the victim several times because the victim kept getting up.

Accordingly, in reviewing the record in a light most favorable to the State, we conclude that the evidence supported the jury's finding that the murder was especially atrocious or cruel in that it involved torture and depravity of mind.[10]

### Avoiding, Interfering With, or Preventing a Lawful Arrest or Prosecution

The defendant asserts that the aggravating circumstance in Tenn. Code Ann. § 39-2-203(i)(6) (1982) was improperly applied for several reasons. He contends that the aggravating circumstance applies in every case in which the victim knows the defendant and therefore fails to narrow the class of death-eligible offenders; that the prosecution should not have been allowed to use this aggravating circumstance since it was not relied upon in the original sentencing proceeding; and that the evidence was insufficient to support the jury's application of this aggravating circumstance. The State maintains that the aggravating circumstance was properly applied and that the jury's finding was supported by the evidence.

### Constitutionality

At the time of this offense, this aggravating circumstance was applicable where "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-2-203(i)(6) (1982). We have upheld the application of this factor in a number of circumstances. See Terry v. State, 46 S.W.3d at 161. Moreover, we have previously rejected the defendant's argument that the aggravating circumstance is unconstitutional for failing to narrow the class of death-eligible offenders. State v. Bush, 942 S.W.2d 489, 504-05 (Tenn. 1997).

In this case, the defendant Bane was charged with the felony murder of the victim in the perpetration of a robbery. See Tenn. Code Ann. § 39-2-202(a) (1982). The offense required the

---

[10] Although the jury's finding that the murder was "especially atrocious or cruel in that it involved torture and depravity of mind" did not track the language of the statute, the defendant has not asserted the discrepancy as error. We conclude, however, that by finding "torture and depravity of mind" the jury's finding was even more comprehensive than required by statute and, therefore, did not prejudice the defendant.

State to establish that the victim was killed in the perpetration or attempt to perpetrate the robbery of the victim. Obtaining a conviction for felony murder did not require evidence that the killing was for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution. Instead, that additional evidence was necessary to establish the aggravating circumstance for sentencing. See Tenn. Code Ann. § 39-2-203(i)(6) (1982). Thus, the aggravating circumstance did not duplicate the elements of the underlying offense and sufficiently narrowed the class of persons eligible for the penalty of death. See State v. Bush, 942 S.W.2d at 505 (upholding (i)(6) aggravating circumstance as applied to premeditated murder).

**Prosecution's Reliance in Re-sentencing**

We also conclude that the prosecution was not barred from relying on this aggravating circumstance for the re-sentencing. In State v. Harris, we held that where a defendant is sentenced to death and then receives relief on appeal, the prosecution is not prohibited from again seeking the death penalty at re-sentencing. 919 S.W.2d 323, 330 (Tenn. 1996). Moreover, we concluded that under the so-called "clean slate" rule, the prosecution is free "to introduce proof of any aggravating circumstance which is otherwise legally valid." Id. We explained that a death sentence is not a series of "mini-trials" on each aggravating circumstance and that there is no such thing as an "acquittal" of an individual aggravating circumstance. Id. (citing Poland v. Arizona, 476 U.S. 147, 106 S. Ct. 1749, 90 L. Ed. 2d 123 (1986)). Finally, we observed that there was no other legal impediment precluding the prosecution from relying on any aggravating circumstance and strengthening its case in any way it can "by the introduction of new evidence." Id. at 331.

The defendant's reliance on State v. Phipps, 959 S.W.2d 538 (Tenn. 1997), is misplaced. In Phipps, the defendant was convicted of first-degree murder and sentenced to life imprisonment following a trial at which the State did not seek the death penalty. After the defendant successfully appealed his conviction and obtained a new trial, the prosecution filed notice of its intent to seek the death penalty. We held that since the prosecution had not sought the death penalty at the original trial, its decision to do so after the defendant's successful appeal created a presumption of vindictiveness. 959 S.W.2d at 546. Moreover, we held that the prosecution would have to rebut the presumption of vindictiveness with clear and convincing evidence that its decision was motivated by a legitimate purpose. Id. at 547.

In contrast, the prosecution in the present case filed notice of its intent to seek the death penalty at the defendant's initial trial, and the jury did in fact impose a death sentence. After the case was remanded for re-sentencing, the prosecution again sought the death penalty, which it was entitled to do. Although the prosecution did not rely on the (i)(6) aggravating circumstance at the initial sentencing proceeding, our decision in Harris makes it clear that the "clean slate" rule applied to re-sentencing. Thus, the prosecution was not barred from relying upon the aggravating circumstance in Tenn. Code Ann. § 39-2-203(i)(6) (1982) in re-sentencing.

## Sufficiency of Evidence

As discussed above, when considering the sufficiency of the evidence supporting an aggravating circumstance, we must review the evidence in a light most favorable to the State and determine whether a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt.

In this case, the defendant planned the robbery of the victim with Donna Lovett, who was an acquaintance of the victim. The defendant said that the victim would have to be killed because he knew Donna Lovett and could report that she was involved in the offense. In committing the murder, the defendant and Donna Lovett robbed the victim of over $700 and various personal property. In short, a rational trier of fact could conclude that the defendant killed the victim to avoid, interfere with, or prevent a lawful arrest or prosecution of himself and Donna Lovett. Accordingly, we conclude that the evidence was sufficient to support the jury's application of this aggravating circumstance.

## Proportionality

Where a defendant has been sentenced to death, we must undertake a comparative proportionality review pursuant to Tenn. Code Ann. § 39-13-206(c)(1) (1997). The analysis is designed to identify aberrant, arbitrary, or capricious sentencing by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984)). If a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed," then the sentence is disproportionate. Id. at 668; see also State v. Burns, 979 S.W.2d 276, 283 (Tenn. 1998).

This Court has consistently employed the precedent-seeking method of comparative proportionality review, which compares a case with cases involving similar defendants and similar crimes. State v. Bland, 958 S.W.2d at 667. We consider numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect on non-decedent victims. Id. We also consider multiple factors about the defendant: (1) prior criminal record; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. Id. Since no two defendants and no two crimes are precisely alike, our review is not mechanical or based on a rigid formula. See id. at 668.

In reviewing the facts and circumstances of the offense, the evidence shows that the defendant actively planned the robbery of the victim, who was an acquaintance of the defendant's girlfriend, Donna Lovett. The defendant said that the victim would have to be killed because he

would recognize Lovett and report the offense. The defendant discussed stabbing or choking the victim. On the day of the murder, Bane, Lovett, and Lovett's two teenage sons drove past the victim's home several times, waiting for the victim to arrive home. When the victim arrived home, Donna Lovett approached his house while Bane left the scene with Lovett's sons. When Bane later returned, he waited for a prearranged signal from Donna Lovett before entering the victim's home.

Bane repeatedly beat the 60-year-old victim as the victim tried to resist. The victim suffered bruises and injuries to his head, eyes, hip, and arm. Bane and Lovett eventually gagged the victim with a cloth, placed a plastic bag over his head, tied the bag around his neck with an electrical cord, and strangled him. The victim was placed in a bathtub of water and a plunger was used to hold his head under the water. There was evidence of fluid in the victim's lungs consistent with a finding that the victim had been alive when placed in the water. The cause of the victim's death was ligature strangulation with asphyxia.

Bane presented witnesses in mitigation who testified that he formerly worked on a farm and was a good worker. The defendant has two sons by a former marriage. He also has a wife who he married while incarcerated for the conviction in this case. Although Bane's precise age is not in the record, one witness said that the defendant was "in his twenties" or much younger than the 60-year-old victim. There was no evidence that the defendant had any medical, emotional, or mental problems. Bane played a major role in the offense and did not cooperate with authorities or express remorse for the victim. The main theory of the defense in mitigation was impeaching the testimony of Brian Lovett and attempting to raise doubts about the defendant's involvement in the offense.

As the State asserts on appeal, this Court has upheld the death penalty in many cases bearing similarities to this one. In the following cases, for example, the victims were killed in the course of a robbery. State v. Chalmers, 28 S.W.3d 913, 919 (Tenn. 2000); State v. Smith, 993 S.W.2d 6, 18 (Tenn. 1999); State v. Burns, 979 S.W.2d 276, 283 (Tenn. 1998); State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993); State v. Bates, 804 S.W.2d 868, 883 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589, 595 (Tenn. 1990); State v. King, 718 S.W.2d 241, 245 (Tenn. 1986). In several cases, the victim was known to the defendant or an accomplice. See, e.g., State v. Bush, 942 S.W.2d 489, 507 (Tenn. 1997); State v. McNish, 727 S.W.2d 490, 491 (Tenn. 1987).

Several cases involve facts and circumstances of a killing similar to the present case. In the following cases, the victim was beaten by the defendant. State v. Hall, 8 S.W.3d 593, 606 (Tenn. 1999); State v. Mann, 959 S.W.2d 503, 516 (Tenn. 1997); State v. Bush, 942 S.W.2d at 507; State v. Barber, 753 S.W.2d 659, 668 (Tenn. 1988); State v. McNish, 727 S.W.2d at 491. In numerous cases, the victim has been beaten and strangled. State v. Carruthers, 35 S.W.3d 516, 527 (Tenn. 2000); State v. Keen, 31 S.W.3d 196, 208 (Tenn. 2000); State v. Vann, 976 S.W.2d 93, 99 (Tenn. 1999); State v. Cauthern, 967 S.W.2d 726, 732 (Tenn. 1998); State v. Mann, 959 S.W.2d at 507; State v. Hodges, 944 S.W.2d 346, 350 (Tenn. 1997).

The Court has upheld similar death sentences in which one of the aggravating circumstances was that the killing was heinous, atrocious, or cruel in that it involved torture or depravity of mind,

see Tenn. Code Ann. § 39-2-203(i)(5) (1982), or the killing was heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death, see Tenn. Code Ann. § 39-13-204(i)(5) (2000). See State v. Carruthers, 35 S.W.3d at 531; State v. Keen, 31 S.W.3d at 211; State v. Hall, 8 S.W.3d at 606; State v. Vann, 976 S.W.2d at 98; State v. Cauthern, 967 S.W.2d at 729; State v. Mann, 959 S.W.2d at 507; State v. Bush, 942 S.W.2d at 507; State v. Barber, 753 S.W.2d at 668; State v. McNish, 727 S.W.2d at 491. The Court has likewise upheld similar death sentences where the killing was committed to avoid arrest or prosecution. See State v. Bush, 942 S.W.2d at 504; State v. Smith, 857 S.W.2d 1, 14 (Tenn. 1993); State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989); State v. Carter, 714 S.W.2d 241, 250 (Tenn. 1986).

Finally, in considering characteristics regarding this defendant, it appears that we have upheld the death sentence in several cases where the defendant has presented similar mitigating evidence, such as an employment record, a marriage, or children. See State v. Burns, 979 S.W.2d at 283; State v. Cauthern, 967 S.W.2d at 740-41; State v. Hall, 958 S.W.2d 679, 700 (Tenn. 1997); State v. Bland, 958 S.W.2d at 670; State v. Van Tran, 864 S.W.2d 465, 482 (Tenn. 1993).

In sum, our review requires a determination of whether a case plainly lacks circumstances found in similar cases where the death penalty has been imposed. See State v. Burns, 979 S.W.2d at 285. The defendant has cited no specific case as authority for his argument that the death penalty is arbitrary or disproportionate as applied in this case. Likewise, although the dissent asserts that the comparative proportionality analysis is flawed, it fails to assert or establish that the sentence of death is either arbitrary or disproportionate as applied in this case to this defendant. Moreover, a majority of the Court has already addressed and rejected the views of the dissent and has consistently adhered to the proportionality analysis carefully detailed in Bland. See State v. Keen, 31 S.W.3d at 223-24. Finally, as we have discussed, the similarity of the facts and circumstances of this case to numerous cases in which the death penalty has been upheld reveals that the death sentence is not arbitrary or disproportionate as applied in this case.


**CONCLUSION**

In accordance with Tenn. Code Ann. § 39-2-205(c) (1982) and the principles adopted in prior decisions, we have considered the entire record and conclude that the evidence supports the jury's finding of the statutory aggravating circumstances; that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances; and that the sentence is not arbitrary, excessive, or disproportionate.

We have reviewed all of the issues raised by the defendant and conclude that they do not warrant relief. With respect to issues not addressed in this opinion, we affirm the decision of the Court of Criminal Appeals authored by Judge David H. Welles and joined by Judge Jerry L. Smith and Judge James Curwood Witt, Jr. The relevant portions of that opinion are attached as an appendix to this opinion. The defendant's sentence of death is affirmed and shall be carried out on

the 6th day of November, 2001, unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of the appeal are taxed to the State.

                       _____

                       RILEY ANDERSON, CHIEF JUSTICE