IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 17, 2004

**STATE OF TENNESSEE v. TERRANCE CECIL**

**Appeal from the Circuit Court for Maury County**
**No. 13621      Jim T. Hamilton, Judge**

─────────────

**No. M2004-00161-CCA-R3-CD - Filed December 30, 2004**

─────────────

A Maury County Circuit Court jury convicted the defendant, Terrance Cecil, of possessing twenty-six grams or more of cocaine with intent to sell, a Class B felony, and the trial court sentenced him as a Range I, standard offender to ten years to be served in the Department of Correction. On appeal, the defendant contends that the evidence is insufficient to support his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Rhonda D. Hooks, Columbia, Tennessee (on appeal), Claudia S. Jack, District Public Defender, and Shipp R. Weems, Assistant Public Defender, (at trial), for the appellant, Terrance Cecil.

Paul G. Summers, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Brent A. Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the defendant's arrest on July 9, 2002, with 3.8 grams of cocaine tucked behind his scrotum and 24.3 grams of cocaine inside a teddy bear on the back seat of the car in which he was riding. The defendant was sitting on the front passenger seat, Kevin Ingold was driving the car, and Cameron Alexander was sitting on the rear seat with the teddy bear when the three men were stopped by a police officer.

Cameron Alexander testified that on July 9, 2002, he asked Mr. Ingold to help him get an ounce of cocaine. Mr. Alexander said he wanted merely to make some extra money and was not in the regular business of selling drugs. He said Mr. Ingold agreed to get an ounce of cocaine for him and made a telephone call. He testified that afterward, he and Mr. Ingold drove to an apartment

building, picked up the defendant, and headed for the "east side" of Columbia, Tennessee. He said that during the drive he handed the defendant $1000.00 in cash to purchase the ounce of cocaine and that the defendant took the money. He said they dropped the defendant off in front of a house and then drove to a different location and parked, waiting for the defendant to call. He testified that approximately five or ten minutes later the defendant called, and they returned to the house to pick him up. He said the defendant entered the car, sat on the front passenger seat, and handed him the drugs. Mr. Alexander testified that he placed the drugs inside a teddy bear that he had brought with him for this purpose and that the three men started driving away. He said within five to ten minutes, police officers signaled them to pull over. He said the police officers grabbed the defendant, searched him, and placed him in handcuffs. Mr. Alexander said he heard the defendant tell the officer, "The white boy had the dope in the backseat." He said the officers then removed Mr. Ingold and himself from the car. Mr. Alexander testified that he made no deals with the state regarding his testimony.

On cross-examination, Mr. Alexander admitted that the arrest terrified him and that he would do "anything in the world" to avoid going to jail, which included lying. He said that he was not lying during his testimony, however. He admitted that he spoke with the district attorney and reiterated that the state did not offer him a deal in exchange for his testimony.

Sergeant Thomas Ehret, of the Columbia Police Department, testified that he was working as supervisor of the crime suppression unit on July 9, 2002, and that they were experiencing heavy drug traffic on the east and west sides of Columbia at that time. He said that he was driving an unmarked police car and that unmarked cars only look for violations of the law and do not stop vehicles unless an emergency arises. Departmental policy requires the officer in an unmarked car to call for a marked police car if the officer observes a violation of the law and, until the marked unit arrives to make the stop, the officer in the unmarked car only continues to observe the suspect(s).

Officer Ehret testified that the incident involving the defendant began when he observed a grey vehicle stopped on West 9th Street in front of the house where a man known as "Nay-Nay" lived. He said "Nay-Nay" was a drug dealer, and the police had made narcotics raids of the house on several occasions. He said the defendant emerged from "Nay-Nay's" house and entered the grey vehicle which drove away, and Officer Ehret followed it. He said the vehicle proceeded to roll through a stop sign, at which point he called for a marked police car to stop the vehicle for the traffic violation. He testified that the officers driving marked cars were busy so he continued following the grey vehicle, which dropped the defendant off at a different house and then stopped at Fairview Park. He said the vehicle sat for approximately ten minutes before the occupants drove back to the place they left the defendant, picked him up, and drove away. He said no one exited or entered the car while it was stopped. He said approximately ten or fifteen minutes later, Officer Morgan arrived in a marked police car and stopped the grey vehicle. Officer Ehret remained in his car and observed the arrest. On cross-examination, he testified that he did not see the defendant with cocaine or carrying anything that appeared to be cocaine.

Officer Vince Morgan testified that on July 9, 2002, Officer Ehret observed a grey vehicle committing several traffic violations and called for a marked police car to stop the vehicle. Officer Morgan said he located the vehicle and stopped it. The defendant was sitting on the front passenger seat. He said that as he approached the car he observed the defendant "go under a seat and come back up." Officer Morgan said he unsnapped the retention device on his weapon and as he drew nearer the car, he observed the defendant reach inside of his pants. He said he told his partner, Officer Martin, what he had observed and instructed him to remove the defendant from the vehicle. He testified that the defendant said, "There's an ounce of dope in the backseat; it ain't mine" when he exited the car. Officer Morgan said he handcuffed the defendant, searched him for weapons, and placed him in the back of the police car. He said he discovered one hundred dollars in cash on the defendant's person which the defendant claimed was for shopping. He said that he advised the defendant of his Miranda rights and that the defendant told him again, "There's an ounce of dope in the backseat; it's the skinny white dude."

Officer Morgan testified that the three men were separated when they arrived at the police station and that he and another officer conducted a strip search of the defendant. He said during the search a plastic bag containing white powder fell from behind the defendant's scrotum, and the officers found $337.00 hidden in his shoes. Officer Morgan said that Mr. Alexander's testimony in court was consistent with the verbal and written statements he gave the police. On cross-examination, Officer Morgan said the police did not find the $1000.00 that Mr. Alexander allegedly gave the defendant. He also testified that the defendant gave him four different stories concerning the incident: (1) He did not know that cocaine was in the car, (2) he knew about the cocaine only because he overheard the two men talking about it, (3) he heard the man in the back say he had "an ounce of dope" when the police light went on, and (4) the two men were merely giving him a ride to pick up his cellular telephone.

Kathy Carman, a chemist working for the Tennessee Bureau of Investigation, testified that she tested the 3.8 grams of white powder discovered under the defendant's scrotum and the 24.3 grams found in the teddy bear, and she identified the substance as cocaine.

The defendant testified that on July 9, 2002, he called Mr. Ingold because he needed a ride to pick up the telephone he had left at his cousin "Moot's" house the previous night. He said that Mr. Ingold arrived with a "white dude" he did not know sitting on the back seat of his car. He said he asked the two men to "make a block" when they arrived at Moot's house because the neighborhood was dangerous for white people. He said that because his cousin was not at home, he called Ingold to pick him up, which he did. He said they were subsequently pulled over by the police, at which point the white man in the back told them he had an ounce of cocaine. The defendant said the police approached the car, grabbed him and accused him of "stuffing something." The defendant said that he told the police that the man in the back had an ounce of cocaine and that he did this because he had nothing to do with the drugs. The defendant claimed that he never saw the $1000.00 in cash, the teddy bear, or any drugs other than the cocaine discovered during the strip search, which he claimed was for personal use. He said he had used cocaine for approximately one and one-half years.

During cross-examination, the defendant said that he no longer used drugs and that he had purchased the drugs found in his pants from a man named "Little Tony." He claimed that he hid the cocaine behind his scrotum before Mr. Ingold picked him up to prevent its discovery. He denied having his hands in his pants when the police officers approached the car and admitted that his cousin Moot is a convicted drug dealer.

The defendant contends that the evidence was insufficient to convict him because a person cannot be convicted solely on the uncorroborated testimony of an accomplice. He asserts that Mr. Alexander was an accomplice and that the state failed to present sufficient corroborative evidence independent of his testimony to show that the defendant was implicated in the offense. The state contends that sufficient corroborating evidence exists. We agree with the state.

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury as is the question whether an accomplice's testimony is sufficiently corroborated. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); Stanley v. State, 222 S.W.2d 384, 387 (Tenn. 1949).

Mr. Alexander was an accomplice to the offense charged. An accomplice is one who "knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime." State v. Green, 915 S.W.2d 827, 830 (Tenn. Crim. App. 1995). Mr. Alexander admitted wanting to purchase an ounce of cocaine for resale and that the cocaine in the teddy bear belonged to him.

A conviction cannot be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001). Other evidence must exist, entirely independent from the accomplice's testimony, which establishes the defendant's identity and leads to the inference, in and of itself, that the defendant is implicated in the commission of the crime. Id. The evidence may be direct or entirely circumstantial, and it need not be adequate, taken by itself, to support a conviction; "it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged." Id. (citations omitted). Moreover, the corroborative evidence need not extend to every part of the accomplice's testimony.

The evidence viewed in the light most favorable to the state reveals through Mr. Alexander's testimony that he, the defendant, and Mr. Ingold, planned to acquire an ounce of cocaine for the purpose of resale. Mr. Ingold and Mr. Alexander picked up the defendant and gave him $1000.00 to buy the drugs. The three men drove to the defendant's cousin's house on the east side of Columbia, Tennessee. Approximately ten to fifteen minutes later, Mr. Alexander and Mr. Ingold picked up the defendant who delivered the drugs to Mr. Alexander. Mr. Alexander placed the

cocaine inside a teddy bear brought for the purpose of concealing the drugs, and the three men drove away. The police apprehended them a short time later.

This testimony was sufficiently corroborated by the testimony of other witnesses. Sergeant Ehret said that he observed Mr. Ingold pick up the defendant at Nay-Nay's house, which had been the subject of narcotics raids on several occasions. Sergeant Ehret followed the men and watched as the defendant was dropped off at the house of his cousin Moot, who the defendant admitted was a known and convicted drug dealer. Ten or fifteen minutes later, Officer Morgan stopped the defendant and the other two men. Officer Morgan testified that he observed the defendant put his hands down his pants and, later, a strip search of the defendant revealed a plastic bag containing 3.8 grams of cocaine behind his scrotum. A search of the grey vehicle revealed a teddy bear containing 24.3 grams of cocaine, which the defendant admitted knowing was present. An ounce of cocaine equals 28 grams. The combined weight of the cocaine in the teddy bear and the plastic bag in the defendant's pants was 28.1 grams. We conclude that the testimony of the other witnesses, taken by itself, is sufficient to infer that the defendant was implicated in the commission of the offense, and we hold that the evidence is sufficient to support the defendant's conviction.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, JUDGE