# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs at Knoxville October 27, 2009

## STATE OF TENNESSEE v. ANTONIO SANTIAL JONES

**Appeal from the Criminal Court for Davidson County**
**No. 2007-A-628     Monte Watkins, Judge**

---

**No. M2008-01254-CCA-R3-CD  - Filed May 10, 2010**

---

The Defendant, Antonio Santial Jones, appeals his conviction by a jury in the Davidson County Criminal Court for second degree murder, a Class A felony, for which he was sentenced as a Range I, violent offender to twenty-two years in the Department of Correction. The Defendant contends that the evidence was insufficient to support his conviction and that the testimony of two witnesses should have been considered accomplice testimony, requiring independent corroboration. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and JOHN EVERETT WILLIAMS, JJ., joined.

Kristen Vanderkooi, Nashville, Tennessee (on appeal); Reginald L. Horton, Nashville, Tennessee (at trial), for the appellant, Antonio Santial Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant was indicted for first degree murder in the shooting death of Michael Scott. At the trial, Ira Christian testified that on October 4, 2006, she was living in an apartment at 226 Susanna Drive in Davidson County. She said she had known the victim for a couple of months. She said the victim was also known by the nickname "Bushwick." She said that she had known the Defendant for about three years and that he was also known by the nickname "Sandwich." She said that the Defendant had a key to her apartment but that

he did not live there.   She said he sometimes came to her apartment to shower, to sleep, or to change clothes.

Ms. Christian testified that on the morning of the shooting, she was getting ready for work. She said that someone knocked on her door and that the Defendant came into her bedroom to tell her that the victim was at the door.  She said another man, whom she did not know, was with the Defendant.  She guessed that he entered her apartment with the Defendant.  She said that when she went outside, the victim was sitting in a chair in the breezeway between the apartments.  She said that the victim asked her for money and that she told him no.  She said she knocked on the door of her neighbor, Shanera Jones, to wake Ms. Jones for an appointment.  She said the victim was still sitting in the chair.  She agreed that she, the victim, and Ms. Jones had a brief conversation.  She did not know when the man who was with the Defendant left her apartment, but she said he may have left when she was knocking on Ms. Jones's door because she noticed that someone walked down the stairs.

Ms. Christian testified that the Defendant came outside and asked the victim if the victim owned a purple vehicle.  She said that the victim replied that he had owned a purple vehicle but that he had sold it.  She said the Defendant began to walk away, toward the stairs, and then turned and raised the right side of his shirt, revealing a handgun.  She said the victim jumped out of the chair, ran toward the Defendant, and scuffled with the Defendant.  She said she heard a gunshot.  She could not remember in what way the Defendant held the gun, but she said it was not pointed at the victim at the time he was running toward the Defendant.  She said that the victim's back was to her and that she could see the Defendant's face.  She did not know the type of gun, but she thought it was silver.  She said that after she saw the gun, she backed into her apartment and closed and locked the door.  She did not remember yelling or saying anything to either man.  She said she was stunned and scared. She said she heard the gunshot after she closed the apartment door.  She said there was only one gunshot.

Ms. Christian testified that she did not hear anything else and opened her door.  She said that she saw the victim coming toward her apartment and that she pulled him into her apartment.  She said that the Defendant was gone and that all she saw was the tail end of a white car as it left.  She said that the victim told her to call the police and that she did.  She said that by the time the police arrived, the victim was deceased.  She said that he was lying on the rug and that she held him in her arm while she talked to the police.  She said she believed that Ms. Jones returned to Ms. Jones's apartment.  She said that she was in shock and crying, and she agreed that she was hysterical.

Ms. Christian testified that she did not want to talk to the police at the scene.  She said it was because she was scared that something might happen to her.  She said that she also did

not immediately tell the police everything because she was scared. She agreed that Detective Moss took her to the police station at a later time and that what she told the police on that occasion matched her testimony at the trial. She said she had been a friend of both the victim and the Defendant.

On cross-examination, Ms. Christian testified that she and the victim were involved in a sexual relationship. She believed they met at a sports bar. She did not know anything about his background, and she said he did not have a key to her apartment. She could not give a physical description of the man who was with the Defendant. She did not know how long he had been in her apartment because she had been asleep when he entered. She agreed that she was outside when the other man left but that she did not look at him. She said the other man did not say anything to the victim, who was still sitting in the chair.

Ms. Christian testified that when the Defendant left her apartment and walked toward the stairs, the victim remained seated. She said the victim did not get up until the Defendant turned. She said that she backed into her apartment at that point but that she did not close the door until after she had seen the Defendant's gun, the victim had run toward the Defendant, and the men had started scuffling. She agreed that she did not see what happened during the scuffle. She said she heard just one gunshot. She agreed it looked as if the victim had been shot in the wrist. She said that when she called the police, she told them a man had been shot but did not tell them the identity of the shooter. She did not recall at first whether she gave a description of an individual different from that of the Defendant, but she later agreed that the description she gave was not of the Defendant. She acknowledged that her original statement to the police was that a man had run up the stairs, shot the victim, and left. She agreed that she did not tell police that the Defendant and another man had been in her apartment. She said she was afraid of the Defendant and in fear for her life. She acknowledged that she had known the Defendant for years, that he had a key to her apartment, and that the Defendant had never physically harmed her.

Ms. Christian testified that she was arrested for a felony drug offense and criminal impersonation on October 13. She agreed that she was visited by a detective on October 17, while she was in jail. She could not recall the exact date, but at some point while she was still in jail, she told the detective that she knew who shot the victim. She agreed the charges against her were dismissed in exchange for her testimony against the Defendant. She said, however, that she did not speak to the detective about dismissing the charges. She said it was the public defender who told her that the charges against her would be dropped if she discussed what happened in this case and that this occurred on October 23. She agreed that even though she had the chance on October 4, she did not mention that the Defendant was the shooter until October 17.

On redirect examination, Ms. Christian testified that she told Detective Moss what happened, that Detective Moss did not talk to her about her pending charges, and that he did not make promises about anything. She said she told Detective Moss everything that happened in connection with the shooting. She said that the charges were dismissed at a later date.

Shanera Jones, who was not related to the Defendant, testified that she did not know the victim, but she had heard the nicknames "Sandwich" and "Bushwick." She said that she had lived alone in a one-bedroom apartment at 223 Susanna Drive for about two years. She said that she was twenty-one years old and had worked with her aunt and uncle at their stall at the farmer's market since she was sixteen or seventeen. She said this was her first time living on her own. She said that Ms. Christian rented the apartment across from hers, that she met Ms. Christian shortly after she moved in, and that they visited each other. She said that Ms. Christian was like a big sister to her and helped her with many things she did not know how to do.

Ms. Jones testified that Ms. Christian introduced the Defendant as a friend. She said that she met the Defendant at Ms. Christian's apartment but that the Defendant had never been inside her apartment. She said that on October 4, 2006, she had an appointment at 10:45 a.m. at the Department of Human Services to apply for TennCare. She said that Ms. Christian was supposed to wake her before Ms. Christian left for work. She said Ms. Christian knocked, she answered, and a man was sitting in one of the chairs outside her door, in the breezeway between the apartments. She said that Ms. Christian had introduced him to her as "Bushwick." She said she went back inside to brush her teeth and to put on some shorts. She said that "Bushwick" did not appear to have a weapon. She said he did not appear upset or angry. She said that he did not speak to her but that she had a conversation with Ms. Christian. She said she sat on her couch with the door open, talking to Ms. Christian.

Ms. Jones testified that Ms. Christian was talking to the victim when the Defendant came outside. She said the Defendant asked the victim if he drove a purple van. She said that the victim said something else and that she saw the Defendant "pull back" and she saw the Defendant was holding a handgun. She said the victim did not have a weapon in his hands. She said she did not hear either man say anything else because she locked her door and went into her bedroom. She said she heard Ms. Christian say things such as "No, Antonio," "Stop, Antonio," and "Stop, Sandwich." She said Ms. Christian did not say anything similar to the victim. She said she heard one shot after she closed her door. She thought she heard two more shots after she reached the bedroom, but she could not remember. She said that when she heard nothing else, she looked through the door's peep hole and saw Ms. Christian helping the victim into Ms. Christian's apartment. She said she

helped them. She said she saw blood on the landing outside the apartments. She said Ms. Christian called the police while she got a cold rag from the bathroom. She said that the victim was shaking. Although she saw blood, she could not see where the victim's injuries were on his body. She did not recall that the victim had a weapon. She said that she did not see the Defendant leave but that she heard a car drive away. From a crime scene photograph, she identified an overturned green chair as the one in which the victim had been sitting.

Ms. Jones testified that she did not tell Detective Moss at the scene who had committed the crime because she was frightened that the Defendant would return and harm her because she was a witness. She said she had never experienced anything like witnessing a shooting. She agreed that she did not know what to do. She said she stayed with family members and her boyfriend afterwards. She said Detective Moss interviewed her again, away from the scene. She agreed that she ultimately had to do the right thing and tell what had happened. She said her father told her it was the right thing to do, as well. She said the police did not threaten or coerce her. She said they promised to help her move but that it had not happened. She said she provided the police with the Defendant's first and last name and his nickname. She said she learned his full name through talk in the neighborhood. She said she later identified the Defendant in a photograph lineup. She said she had no doubt that the man she identified was the man who pulled the gun right before she heard gunshots. She said that she saw Ms. Christian on occasion but that they did not talk about the shooting.

On cross-examination, Ms. Jones testified that she could see the victim sitting in the breezeway from where she sat on her couch. She said she did not see another man leave Ms. Christian's apartment. When asked whether the Defendant was walking away from the victim, she said the Defendant was walking toward the victim. She said that the Defendant asked the victim if he drove a purple van, that the victim replied that he did, and that the victim said something such as "that was my cousin." She said that the Defendant pulled out his gun and that she went into her apartment. She said that she did not see them scuffle but that when the Defendant pulled the gun, the victim tried to reach for it. She said the men were standing next to each other when she went inside her apartment. She said the Defendant was facing the victim and her. She agreed that the victim made a motion as if to convey, "No, don't shoot me." She agreed that she heard three gunshots. She could not say whether the victim had a weapon. She said that after she helped Ms. Christian with the victim, she retrieved some clothes and went to her cousin's house. She said her cousin encouraged her to tell the police what she saw. When asked whether Ms. Christian gave her the same advice, she replied that Ms. Christian had not.

Ms. Jones testified that she knew the Defendant before the shooting and that she could have given an accurate description of him. When asked whether she gave a description of the person who allegedly shot the victim, she replied, "Yeah, but no." She said that she

described the Defendant "to a certain extent" but that she was scared. She could not remember whether she told police that the shooter had gold teeth. She did not agree that she followed Ms. Christian's lead in responding to the detective's questions. She said she did not give the detective the Defendant's nickname on the day of the shooting. She said that she and Ms. Christian talked about the description of the assailant in passing, when the detective was there. She said that the detectives interviewed her in her apartment and that Ms. Christian might have been there. She said that Ms. Christian told her the Defendant's full name on the day after the shooting and that she also heard it from some of her cousins. She agreed that she did not call the police when she learned the Defendant's name, but she said she gave them his name about two days later or whenever it was that she talked to the detective. She said the detective came to talk to her while she was staying at her father's house. She acknowledged that the Defendant had not threatened her and that she had never seen him commit a violent act.

Officer Clarence Fayne with the Metropolitan Nashville Police Department (Metro) testified that he responded to the scene of the shooting on October 4, 2006. He said Officer David Miller was already present. He said that paramedics had arrived before him and that they were trying to revive the victim. He said he was accompanied by an officer trainee, Jason Spencer, whom he directed to assist Officer Miller in roping off the crime scene. He also directed Officer Spencer to begin gathering witness information. He said a large group of people had gathered outside on the sidewalk and roadway. He said that he had been a police officer for twenty-seven years and that his experience as a first responder was that most people do not give out information readily because they do not want to become involved. He said that some people reported they heard something but that no one else saw what happened. He said that Ms. Christian was walking around as if she were in shock. He did not believe that she stated that she knew who shot the victim at that time. He did not recall anyone else crying or acting shocked. He said he did not enter the apartment.

On cross-examination, Officer Fayne testified that he arrived about two or three minutes after the call. He said he roped off the crime scene with Officer Spencer. He said he did not go upstairs. He said he talked to several of the people gathered on the sidewalk but that no one knew what had happened. He said he talked to Ms. Christian, who told him she did not know what had happened. He said he did not see any blood on her clothes. He said he did not know Ms. Jones.

Metro Police Officer Jason Spencer testified that on October 4, 2006, he was an officer in training with Officer Fayne. He said that responders from the Metropolitan Nashville Fire Department had arrived ahead of them and that they were performing CPR on the victim. He said he saw some shell casings on the ground. He said that many of the apartment complex's residents had gathered outside. He said he taped off the scene and

began a log of the individuals coming and leaving the scene. He said his primary concern was to protect the crime scene. He said that he took the names of the residents in apartments 219 and 220, which were near the scene of the shooting. He said he was at the scene for about thirty minutes. On cross-examination, Officer Spencer said that he and a couple of officers went upstairs to Ms. Christian's apartment. He said he saw an African-American woman in the apartment directly across from the apartment in which the victim was lying. He said he did not notice any blood on the woman's clothes. He said he did not speak to anyone who indicated they knew what had happened.

Metro Police Officer William Kirby testified that he worked in the identification crime scene section. He said he was assigned to "work" the scene of the October 4, 2006 shooting at Susanna Drive. He said that he arrived at about 10:30 a.m. and that the scene was already taped off. He said he and Officer Jeremy Barns worked together on processing the scene. He said that he assisted another officer in making a diagram of the scene. He said that his responsibilities did not include knocking on doors and interviewing witnesses. He said that they took photographs, which he identified. He described the objects in the photographs as a gold cross that came from the victim's neck and two shell casings. He said they found a bullet strike mark in the vinyl siding of the breezeway, a strike mark in the concrete, and a "torn up" bullet that had appeared to have struck the concrete. He said the strike mark in the concrete evidenced a ricochet. He said that the two shell casings were from a .45 caliber semiautomatic handgun.

Officer Kirby testified that he also photographed a 1999 Dodge, which was located in the parking lot just outside the breezeway. He said that he collected a .44 magnum Taurus revolver from the floorboard of the car. He said the revolver was loaded with five shells, although it could have held six. He said that the shell casings in a revolver stay in it until manually discharged. He said that the revolver could not have fired the shell casings that were found in the breezeway.

On cross-examination, Officer Kirby testified that the bullet found at the scene most likely made the bullet strike mark on the vinyl siding. When asked what kind of gun fired the bullet, he responded that he would assume it was made by the .45. He was not able to tell whether the bullet came from the same type of casing as the two casings that were found. He said the width of the breezeway was approximately three feet beside the stairs but that it was wider at other places. He said drops of blood were all around the area. He could not tell the direction of the bullet that struck the concrete, but he said it appeared the shot had been aimed at the concrete because the bullet was so disfigured. He could not say whether the victim was standing close to the bullet strike mark on the vinyl when the victim was shot. He said, however, that he understood that the victim was standing in the approximate area. He said he did not talk to Ms. Christian, Ms. Jones, or anyone else at the scene other than the

detectives. He said he was directed to photograph the Dodge by Sergeant Stromatt and Detective Arendall because they had obtained consent to search the car and had found a pistol on the floorboard.

On redirect examination, Officer Kirby testified that there was no way to tell where the empty chamber on the revolver cylinder was before he opened it. He said there was no indication that the weapon had been fired recently. On recross-examination, Officer Kirby said he could tell if a gun had been fired if the barrel was warm. He said that a barrel might stay warm for up to ten minutes and sometimes gunpowder could be smelled. He acknowledged that it was possible the gun had been fired and had cooled by the time he saw it.

Metro Detective Norris Tarkington testified that he and another detective responded to the scene of the shooting. He said the apartment complex where the shooting occurred contained ten to twelve buildings. He said that when he arrived, crime scene tape was around the entrance to one of the apartment buildings and the victim was in the ambulance with the paramedics, who were administering CPR. He said he went into the breezeway that led to steps to the second floor landing. He said he noticed blood on the concrete landing and on the wall. He said he saw two .45 caliber shell casings. He said that Ms. Christian and Ms. Jones were brought to the Criminal Justice Center and that he spoke with them. He said that Ms. Christian appeared sad but that she was willing to talk to him. He said that Ms. Jones did not give him a name or sufficient information to allow him to arrest a suspect at that time. He said that Ms. Christian also did not provide a name but that she described the shooter as a black Hispanic male, six feet tall, twenty-four to twenty-six-years old, with a stocky build, and gold teeth. He said she gave no indication that she knew the identity of the shooter. He said that during his investigation, he discovered that another witness heard the gunshots but did not see anything.

Detective Tarkington testified that no one called the precinct to identify the shooter in the days following the crime. He said that he was unable to determine whether the victim had any enemies. He said he learned that Detective Arendall had a past association with the victim. He said that Detective Moss and Detective Tommy Jerrell interviewed Ms. Jones first and Ms. Christian later. He said he monitored the interviews from another room. He said that based upon the interviews, the Defendant became a suspect. He said they found the Defendant at the Cumberland View housing projects, standing on the landing of one of the apartment's breezeways. He said the Defendant crossed the street and entered a building across the street. He said that he assumed the Defendant had gone into one of the apartments and that they began canvassing the apartment building. He said the Defendant eventually came out of an apartment, at which point he was taken into custody. He said they received consent to search that apartment to look for the weapon and a jacket the Defendant had been

wearing. He said that they found no weapon but that the apartment was in such disarray it was difficult to search.

On cross-examination, Detective Tarkington testified that he arrived at the scene about five or ten minutes after the call. He did not recall seeing blood on Ms. Christian's or Ms. Jones's clothes. He acknowledged that neither woman gave him a name or nickname of the shooter. He said both women told him that a person came up the stairs, took two shots at the victim, ran back downstairs, and left. He agreed that Ms. Christian gave the Defendant's name after she was incarcerated. He said she was presented with a photograph lineup but said she did not recognize anyone. He stated that when she was confronted by Detectives Moss and Jerrell about being untruthful, she pointed to the picture of the Defendant, identified him as Sandwich, and said he was the person who shot the victim.

Detective Tarkington acknowledged that the search of Cumberland View apartment did not reveal any weapons. He said that they found the Defendant's jacket and that no weapons or contraband were in it. He said that he believed the reason he could not find a weapon at the apartment was because it was "worse than dirty."

Metro Detective James Arendall testified that on October 4, 2006, he was directed by his sergeant to check on a victim at the Vanderbilt Hospital emergency room. He said that when he arrived, he was informed that the victim had died at 10:37 a.m. He said he talked to the victim's wife. He said that while he was talking to her, his sergeant called and asked him to obtain the wife's consent to search the victim's car. He said the victim's wife gave consent. He said the first thing he saw when he opened the car was a revolver on the floorboard.

Detective Arendall testified that the victim had testified as a witness in an unrelated robbery case that had occurred three years before. He said that as a result of giving testimony, the victim had created enemies. He said that the victim had called him several times stating that people were making threats and that the victim had once been shot nine times. He said that some witnesses give information at a crime scene but that sometimes people are afraid to be seen talking to law enforcement.

On cross-examination, Detective Arendall testified that in his experience, a person might not reveal everything he or she knew about a crime until after he or she had been interviewed several times. He said that the victim had testified against Nabib Jamal Nateen in an unrelated robbery. He said the victim did not testify against the Defendant. He did not know whether the Defendant was related to Nateen. He said that he did not know who previously shot the victim but that the victim felt it was because of the testimony against Nateen. He said that another department worked the victim's first shooting case.

The parties stipulated that Dr. Amy McMaster was an expert in forensic medicine. Dr. McMaster testified that she conducted an autopsy of the victim's body. She said that the victim had two gunshot wounds. She said that one bullet entered on the left side of the victim's abdomen, traveling downward from left to right, and injured the left renal artery, the mesentery, the rectum, and the pelvis. She said a large caliber bullet was found in the right buttock. She said that a bullet entered and exited the victim's left wrist but that no bullet was found in the body associated with that wound. She said it was possible that if the victim's arm was properly aligned with his torso, one bullet could have entered and exited the left wrist and re-entered the body. She said the victim's injuries would not have incapacitated him immediately. She said that he might have been able to have talked for a few minutes. She said the victim died from loss of blood.

Dr. McMaster testified that she found no evidence of soot or stippling. She said that if soot, or burned gunpowder, were deposited on skin or clothing, it would indicate the gun was fired from a few inches away. She said that either the gun was held farther than a few inches away or something such as clothing was between the barrel of the gun and the skin when it was fired. She said the victim's wound was not consistent with a contact wound. She said that the victim had other scars on his body and that she found an old bullet in his right inner thigh surrounded by scar tissue. She said that the cause of the victim's death was multiple gunshot wounds and that the manner of his death was a homicide. A copy of the autopsy report was received into evidence.

On cross-examination, Dr. McMaster testified that gunpowder stippling was something in addition to soot that could help determine how far away the gun was held when it was fired. She said stippling occurred from unburned gunpowder. She said that stippling indicated the gun was fired within a range of two feet. She said, however, that stippling was variable and depended upon the length of the barrel of the gun, the type of gun, and the type of ammunition. She said there may have been clothing between the gun and the body that prevented stippling. She said she did not examine the victim's clothing. She said the older bullet in the victim's thigh was unrelated to the cause of death.

Metro Detective Michael Moss testified that he was the case detective assigned to the shooting. He said that after he arrived at the scene, he collected information from the other officers who were present. He said the victim was already in the ambulance when he arrived. He said that when he went upstairs to the second floor landing, he saw a gold cross on the ground. He said an officer was standing in the doorway of Ms. Christian's apartment. He said he went to apartments 223 and 226. He said one of the officers introduced him to Ms. Christian and provided a brief account of what had happened. He said he was told that Ms. Christian had pulled the victim into her apartment and had called for the police. He said she was visibly upset. He said he saw Ms. Jones and asked if Ms. Christian could go to Ms.

Jones's apartment to be away from the scene. He said he told the women that he needed to get suspect information and asked them to accompany him to the Criminal Justice Center. He said he was unable to get a name of a suspect from either woman at the scene. He said that at the Criminal Justice Center, Ms. Christian described the suspect as a black male, six feet and one inch, 270 to 300 pounds, wearing a shirt and possibly dark colored pants. He said she thought the suspect had gold teeth. He said this description was broadcast to all patrol officers.

Detective Moss testified that Ms. Christian reported the following: The victim knocked on her door. She answered, and the victim said he was looking for her brother. A large man came up the stairwell, pulled a gun, the men scuffled, and shots were fired. She shut her door but heard someone banging on it a few seconds or a minute later. She looked out of the peep hole and saw the victim. She opened the door, and he asked her to call the police.

Detective Moss testified that Ms. Jones provided the same story except that she said the suspect's head was shaved. He said that they ended the interview but that he was not satisfied that the women had told him everything they knew. He said that in most cases, witnesses will not tell the entire story. He said that he went to see Ms. Jones several days later, after Ms. Christian had been arrested on an unrelated charge. He said Ms. Jones immediately gave him the Defendant's name and nickname. He said that she described the Defendant and that her description matched the one she had given on the day of the shooting. He said she described the events that occurred, which were consistent with her testimony. He said she told him that the Defendant and Ms. Christian had been involved in some type of relationship for several years, although she did not know if it was a sexual one or merely one of friendship. He said she identified the Defendant from a photograph lineup.

Detective Moss testified that by this time, Ms. Christian was in jail. He said he had no interest in her offense or why she was in jail. He agreed that it would have been improper for him to question her about her pending charges. He said he asked her to sign a Miranda rights waiver form as a precaution, which she did. See Miranda v. Arizona, 384 U.S. 436 (1966). He said he had been trained to watch a witness's eyes when she was presented a photograph lineup, because if she recognized a suspect, her eyes would focus on the suspect's picture first. He said Ms. Christian's gaze focused on the Defendant's picture for several seconds. He said she claimed she did not recognize anyone in the photograph lineup. He said that he and the other detectives left the interview room for a few minutes and then returned. He said he told her he knew she was lying and that he knew it was her friend. He said she pointed to the Defendant's picture and stated, "He is the one who did it." He said that she described what had happened on the day of the shooting and that her testimony at the trial was consistent with that description.

On cross-examination, Detective Moss testified that he did not collect the victim's clothes from the scene. He said that he learned from the computer that Ms. Christian was in jail. He said he did not ask her about her charge, but he said she told him it was an old drug charge. He said that Ms. Jones had admitted that she had seen the Defendant many times before the shooting. He did not think that Ms. Jones mentioned a second person being in Ms. Christian's apartment. He said there was no doubt Ms. Jones knew what the Defendant looked like. He said that in his opinion, based upon Ms. Christian's focusing on the Defendant's picture, she knew the Defendant. He agreed that the description the women initially gave of the suspect was generic. He did not know whether the women talked to each other after the shooting. When asked whether the women's second stories were exactly the same, he said they were close.

Detective Moss testified that he agreed to help Ms. Jones move in exchange for her testimony but that he was unable to make it happen. He said she wanted to move because she was afraid. He agreed that he had testified at the preliminary hearing that one bullet struck the victim. He also agreed that it was unclear whether one or two bullets hit the victim. He said that according to the crime scene investigation division, the bullet found at the scene did not strike the victim. He said he did not conduct any tests to determine whether the bullet recovered from the victim matched the shell casings recovered from the scene.

Detective Moss testified that he learned through Detective Arendall, Detective Tarkington, and Sergeant Stromatt that the victim had been a witness to a robbery. He said they pulled the robbery files and determined that none of the known robbery participants were involved in the shooting.

The Defendant did not present any proof. The jury convicted the Defendant of second degree murder.

**I**

The State contends that the Defendant's motion for new trial was untimely filed and that this appeal should be dismissed as untimely. We disagree. Judgment was entered on Friday, February 15, 2008. The Defendant filed a motion for new trial on March 17, 2008, which was a Monday. A motion for new trial must be made "within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). The Rules also provide that time is computed by excluding the day of the event and excluding weekends from the last day of the period. Tenn. R. Crim. P. 45(a). The thirtieth day fell on a weekend. The Defendant's motion for new trial was timely filed, and, thus, this appeal was timely filed, as well.

## II

The Defendant contends that the evidence is insufficient to support his conviction for second degree murder. In this regard, the Defendant also contends that the testimony of Ms. Christian and Ms. Jones should be considered accomplice testimony, requiring corroboration with independent evidence in order to sustain the conviction. The State responds that the evidence was sufficient to support the Defendant's convictions and that Ms. Christian and Ms. Jones were not accomplices. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This means that we may not reweigh the evidence, but must presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Any questions about the credibility of the witnesses were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Second degree murder is the knowing killing of another. T.C.A. § 40-13-210(a)(1) (2006). A knowing killing requires that a person be aware that his conduct is reasonably certain to cause the result. Id. § 40-11-106(a)(20).

Taken in the light most favorable to the State, the record reflects that Ms. Christian and Ms. Jones witnessed the Defendant pull a gun on the unarmed victim. Both women stated that the Defendant and the victim engaged in a struggle. Ms. Jones testified that after she ran into her apartment, she heard Ms. Christian say, "No, Antonio," and "Stop, Sandwich." Ms. Christian also retreated into her apartment. Although neither woman saw the Defendant fire the gun, both heard at least one gunshot within a few seconds. Both saw the victim bleeding from his injuries, and Ms. Christian called the police for help.

The women did not identify the Defendant as the shooter at the scene. However, both women identified the Defendant at later dates as the perpetrator of the crime. Detective Moss and Detective Arendall testified that it was not unusual for witnesses to withhold information at the scene of a crime. Detective Arendall testified that some witnesses were afraid to be seen giving information to the police. Whatever their motivations for withholding information from the police, we must presume that the jury resolved all conflicts in the witnesses' testimony in favor of the State.

-13-

The Defendant's argument that Ms. Christian and Ms. Jones were accomplices and that their testimony requires independent corroboration is misplaced. A conviction cannot be based solely upon the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); Sherrill v. State, 321 S.W.2d 811, 814 (1959). See generally State v. Griffis, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (describing the nature, quality, and sufficiency of evidence necessary to corroborate an accomplice's testimony). The Defendant argues that Ms. Christian and Ms. Jones were "more indictable" for the victim's murder than the Defendant because they were the only witnesses to the crime and because they changed their stories two weeks after the shooting. Nothing in the record, however, indicates that Ms. Christian and Ms. Jones were accomplices in this crime. We conclude that a rational trier of fact could have found the Defendant guilty of second degree murder beyond a reasonable doubt. The Defendant is not entitled to relief on this issue.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE