# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### December 7, 2010 Session

## STATE OF TENNESSEE v. DAMON HOUSTON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-01235    James C. Beasley, Jr., Judge**

---

**No. W2010-00399-CCA-R3-CD - Filed July 8, 2011**

---

On March 8, 2009, the defendant was convicted of especially aggravated robbery, a Class A felony, and sentenced to fifteen years in the Department of Correction.  On appeal, the defendant claims that:  (1) the evidence was insufficient to support his conviction; (2)  the trial court erred by admitting certain evidence; (3) his due process rights were violated by prosecutorial misconduct; and (4) his sentence is excessive.  After careful review of the record, we reject each of these claims and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and ALAN E. GLENN, JJ., joined.

Randall Tolley (on appeal) and Joseph S. Ozment (at trial), Memphis, Tennessee, for the appellant, Damon Houston.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Senior Counsel; William L. Gibbons, District Attorney General; and Chris Lareau, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

At approximately four a.m. on August 30, 2006, the victim, Ms. Jacqueline Payne, was returning to her residence after completing her shift at the Federal Express Hub in Memphis.  She was a short distance from her door when a stranger came around the side of the building.  She attempted to greet the stranger but received no response, and the stranger began to rush toward her.  She initially tried to flee to her door but realized that her two children were at home in the bed and, instead, turned to fight.  She heard her assailant say, "Bitch, I am going to kill you."  She saw an object in the stranger's hand and, during the

ensuing scuffle, she heard a gun go off four times. The victim was shot in three places – her left femur, under her breast, and across her chest. During the course of the melee, the victim was able to get a good look at her assailant, as he was not wearing a mask. After a struggle lasting approximately two minutes, the victim dropped her purse on the ground, and the assailant grabbed it and fled.

The victim, who did not initially realize that she had been injured, used her cell phone to call 9-1-1. Afterward, a neighbor came out and informed her that she had been shot, and assistance arrived. The victim described the perpetrator as a six-foot-one or six-foot-two African-American, weighing 170 or 180 pounds, with shoulder-length dreadlocks, and wearing blue-jean shorts and a white T-shirt. At that time, the police were unable to locate anyone matching that description.

Two days later, the victim returned to her complex to retrieve some personal items. On her way into the complex, she saw her assailant walking down a nearby street. She left the location and phoned the police, but no arrest was made.

One year later, after remarrying and moving to a new location, the victim stopped by a Citgo convenience store near her residence to get a snack. As she pulled in, she saw a man she believed to be her assailant enter the building. She entered the building to get a better look and approached the individual from behind as he was buying something at the front counter. The individual turned around, saw the victim, then fled the building and sped away in his vehicle. The victim wrote down his license plate number and phoned police to identify the individual as her assailant. She also reviewed the store's surveillance tapes and, using the tapes, identified the clothing worn by the individual to police.

Based on the license number provided by the victim, the police developed the defendant as a suspect and prepared a photo lineup. The victim picked the defendant out of this lineup and identified him as her assailant. The next day, the defendant was brought to the police station for questioning. After being advised of his *Miranda* rights, the defendant confessed to the robbery and the shooting.

On February 21, 2008, the Shelby County Grand Jury returned an indictment charging the defendant with especially aggravated robbery. The defendant filed a pretrial motion to suppress his confession and the photo lineup identification, which was denied by the trial court on October 18, 2008. The case was tried by jury on March 5-8, 2009. In addition to the testimony of the victim, as described above, the State presented the testimony of Officer Joseph Knight of the Memphis Police Department, who testified that he responded to the scene of the crime and took the victim's statement; Major Michael Williams of the Memphis Police Department, who testified that he prepared the photo lineup shown to the victim and

that the victim identified the defendant from that lineup; Sergeant Durand Martin of the Memphis Police Department, who testified that he, as lead investigator on the case, interrogated the defendant after reading him his *Miranda* rights and that, after waiving those rights, the defendant confessed to committing the robbery; Sergeant Kedzie White of the Memphis Police Department, who testified that he participated in the defendant's interview and typed the defendant's confession verbatim; Marlinee Iverson, an Assistant District Attorney General in Shelby County, who testified that she participated in a preliminary hearing in this same criminal matter in general sessions court and that, at the preliminary hearing, the victim identified the defendant out of a lineup of defendants in other cases; and Debra Owen, a criminal investigator in the Shelby County District Attorney General's office, who authenticated some photographs and testified that, after driving the route, she determined that the distance between the defendant's residence and the crime scene was between one and one-half and two miles, depending on the route taken. After presenting this testimony, the State rested.

The defense presented several witnesses on the defendant's behalf. Linda Faye Allen, the defendant's mother, testified that, on the night of the crime, she took the defendant to his godmother's recently-purchased house to celebrate a friend's birthday. She further testified that he had no transportation, that she did not pick him up at any point, and that she did not see him again until the following day when he returned home from his job at FedEx. Melvia Hawkins, the defendant's godmother, testified that the defendant's mother dropped him off on the night in question and that the defendant and Hawkins' son spent the night playing video games to celebrate her son's birthday. She testified that the defendant had no transportation and fell asleep on the sofa before being picked up and taken to work by his grandmother the next day. She further testified that the newly-purchased home had an alarm on that night, which would have gone off if anyone had tried to leave, and that the defendant did not have the code to deactivate the alarm. Next, Damon Houston took the stand in his own defense and testified that he did not commit the robbery in question and that he spent the night in question at his god-brother's house without leaving the premises. He testified that he was arrested and interrogated by police despite requesting a lawyer at least three or four times. He further testified that he was left shackled to a bench alone for several hours before the police re-entered his interrogation room and told him that if he did not confess, he would get twenty-five years and would never see his little girl again. As a result, even though he had no idea what his interrogators were talking about, he lied and confessed to committing the robbery out of fear and a desire not to lose his freedom. The defendant's grandmother, Georgia Barnes, took the stand and testified that she picked up her grandson from his godmother's house the morning after the robbery occurred and drove him to his job at FedEx. The defendant's godbrother testified that the defendant spent the night in question playing video games at his residence, that his mother set the alarm before she went to sleep, and that he and the defendant went to sleep without the defendant ever leaving the house.

Patricia Pair, a paralegal employed by defense counsel, took the stand and authenticated certain items, including the defendant's employment records at FedEx and the registrar's office documents pertaining to the sales date of the defendant's godmother's house. She also testified that the distance from the godmother's house to the crime scene was 4.6 miles. At the close of this testimony, the defense rested.

In rebuttal, the State called Sergeant J.D. Smith of the Memphis Police Department, who disputed certain portions of the defendant's account of his interrogation. Afterward, the jury was charged and began its deliberations. On the following day, May 8, 2010, the jury returned with a verdict of guilt on the charge of especially aggravated robbery. On November 9, 2009, the defendant was sentenced to fifteen years as a Range I, violent offender. On February 5, 2010, the defendant's motion for a new trial was denied. This appeal promptly followed.

ANALYSIS

The defendant raises four distinct challenges to his conviction and sentence: (1) the evidence is insufficient to support his conviction, and the State failed to prove the identity of the perpetrator beyond a reasonable doubt, (2) the trial court erred by admitting testimony at an earlier suppression hearing pertaining to the witnesses' identification of the defendant as the perpetrator, as well as by admitting the defendant's confession, (3) the prosecutor engaged in misconduct by making certain arguments and seeking to present certain evidence, and (4) the trial court erred by imposing an excessive sentence. After careful review, we reject each of these challenges for the reasons given below.

I.

"When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *see also* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The defendant urges that the State failed to present evidence from which a rational trier of fact could have found him guilty of especially aggravated robbery beyond a reasonable doubt. However, we observe from the outset that great weight is given to the result reached by the jury in a criminal trial. *Dorantes*, 331 S.W.3d at 379.

Matters such as the credibility of witnesses, the weight given their testimony, and the proper resolution of any conflicts in the evidence are deemed to be the provinces of the jury, and courts will not reexamine them on appeal. *Id.* Rather, "on appeal, the State must be

afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *Id.* (internal quotation omitted). In essence, a jury's verdict of guilt strips the defendant of the presumption of innocence and replaces it with a presumption of guilt. *Id.* The defendant generally bears the burden of overcoming this presumption, *see id.*, and this defendant has not succeeded in doing so.

The essential elements that must be supported by the evidence in this case are those of the crime of especially aggravated robbery. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a) (2011). A robbery is aggravated if it is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon," or if "the victim suffers serious bodily injury." T.C.A. § 39-13-402. A robbery is especially aggravated if it is both "[a]ccomplished with a deadly weapon" and "the victim suffers serious bodily injury." T.C.A. § 39-13-403.

The defendant urges that the evidence is insufficient to establish these elements because (1) numerous defense witnesses testified, establishing an alibi for the defendant on the night in question; and (2) there are reasons to question the accuracy of the victim's identification of the defendant as the perpetrator. However, the evidence presented by the victim in this case suffices to support the conviction. The victim testified that, on the night in question, her purse was stolen by a man using a gun, who accomplished the crime by using physical force during a struggle and shooting her several times in the process, thereby causing her serious bodily injury. The victim further testified that she got a good look at the perpetrator during the struggle and that the defendant was the man who robbed her. Standing alone, this eyewitness testimony is sufficient to support the elements of the offense of aggravated robbery–although, in this case, it was combined with a confession by the defendant for good measure.

While the defendant did present his own alibi witnesses and raised numerous concerns with the victim's eyewitness identification of the defendant, this evidence, taken all together, only served to create a conflict with the State's evidence and raised potential doubts concerning the victim's credibility as a witness. As we have often stated, it is the province of the jury to resolve conflicting evidence and assess the credibility of witnesses, and we will not disturb their judgments in this regard on appeal. *See Dorantes*, 331 S.W.3d at 379. Consequently, the defendant's claim must be denied.

II.

The defendant further argues that the trial court erred in admitting testimony at a pretrial hearing concerning the victim's identification of the defendant as her attacker and

in admitting the defendant's confession. We can discern no merit in either argument.

The defendant's argument that the trial court should not have admitted testimony from the pretrial hearing concerning the victim's identification of the defendant as the perpetrator centers around the fact that the hearing at issue concerned a motion to suppress. The defendant urges upon us that a defendant "may testify at a suppression hearing without incurring the risk that his testimony will be used against him by the prosecution as part of its case in chief." *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn. 1982) (citing *Simmons v. United States*, 390 U.S. 377 (1968)). However, in this case, it was an in-court identification (incidental to the defendant's presence at the hearing), not his actual testimony, that was used against him in court. Indeed, the fact that the hearing pertained to suppression was in no way relevant to the identification that took place – the hearing could just as easily have concerned another pretrial subject matter, so long as both the victim and defendant were present in the courtroom. We see no reason to expand the protections of *Roberge* and *Simmons* beyond the actual content of a defendant's own testimony given at a suppression hearing and certainly not so far as to encompass in-court identifications at pretrial hearings such as the one at issue in the instant case.

As discussed by the United States Supreme Court in *Simmons*, the rationale behind allowing a defendant to testify at a suppression hearing without fear of having his testimony used against him later at trial is that, otherwise, a defendant would often be faced with an undesirable constitutional "Hobson's choice" between electing to exercise his Fourth and Fifth Amendment rights. *See generally* U.S. CONST. AMEND. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ."); U.S. CONST. AMEND. V ("[N]o person . . . shall be compelled in any criminal case to be a witness against himself."). Absent the protection of *Simmons*, a defendant might fail to pursue otherwise meritorious Fourth Amendment claims simply out of fear that the government would later use his testimony from a suppression hearing to establish his guilt at trial, in direct contravention of important Fifth Amendment principles against self-incrimination. As the *Simmons* Court explained, "a defendant with a substantial claim for the exclusion of evidence may conclude that the admission of the [illegally-gathered] evidence, together with the Government's proof linking it to him, is preferable to risking the admission of his own testimony connecting himself with the seized evidence." *Simmons*, 390 U.S. at 393. Without the *Simmons* rule, many meritorious Fourth Amendment claims might never be brought, and the Fourth Amendment rights enjoyed by our society as a whole might diminish.

We see no similar concerns posed by the claim raised today. In light of the numerous other opportunities the State has to conduct, establish, and bolster eyewitness identifications, including photo lineups and in-court identifications at trial such as the ones entered into

evidence in this case, we do not believe that it is reasonably likely that any significant number of defendants will opt not to pursue otherwise meritorious motions to suppress out of the fear that, at the ensuing suppression hearing, a potential eyewitness might use the opportunity to identify him an additional time. The marginal risk imposed on the defendant's case by such an additional identification is simply too slight.

Perhaps more important, the right against self-incrimination does not encompass the right to not be identified by a witness in open court. *See, e.g.*, *Holt v. United States*, 218 U.S. 245, 252-53 (1910) ("But the prohibition of compelling a man in a criminal court to witness against himself is a prohibition of the use of physical or moral compulsion to extort communications from him, not an exclusion of his body as evidence when it may be material."). As a result, the choice confronting this defendant (and others similarly situated) is not the same odious one between exercising two fundamental constitutional rights that the Supreme Court rejected in *Simmons*, "find[ing] it intolerable that one constitutional right should have to be surrendered in order to assert another." *Id.* at 394. The defendant is not forfeiting his right against self-incrimination in order to press a Fourth Amendment or other constitutional claim. While defendants must run a slight risk that their presence in the courtroom, necessitated by their desire to press a constitutional claim, will provide an incidental opportunity for the prosecution to take steps to bolster the credibility of an eyewitness, the incidental opportunity thus created does not infringe on any Fifth Amendment protection that the defendant can rightfully claim. Absent any meaningful conflict between two constitutional rights, the rationale of *Simmons* simply does not extend to situations such as the one we confront in the case at bar. The defendant's claim is denied.

The defendant also urges us that the trial court erred in admitting his confession, on the grounds that the confession was obtained under circumstances that violated the Fifth Amendment of the United States Constitution and Article I, Section 9 of the Tennessee Constitution, both of which protect a defendant from being compelled to be a witness against himself. *See* U.S. CONST. AMEND. V.; TENN. CONST. ART. I, § 9. In response to this claim, the State's brief simply urges us to conclude that the defendant's argument has been waived because the trial court's ruling on the defendant's motion to suppress was not included in the appellate record. However, at some point during the pendency of this appeal, the record in this case was supplemented with the trial court's ruling. In *lieu* of seeking an additional response from the State addressing this issue on the merits, we will issue our ruling based on the record as it now appears before us.

The transcript of the trial court's ruling on the defendant's motion to suppress, dated October 17, 2008, makes clear that the trial court denied the motion to suppress after finding that there was no undue police coercion during the defendant's interrogation nor any violation of the defendant's Miranda rights. This determination is binding on appeal

"[u]nless the evidence preponderates against [the] trial court's findings." *State v. Carter*, 988 S.W.2d 145, 149 (Tenn. 1999). In this case, it does not.

At the suppression hearing, Sergeant Durand Martin testified that prior to interrogating the defendant, he read the suspect his *Miranda* rights and also had the suspect read the *Miranda* rights aloud. He testified that the defendant read and understood his rights and that he never requested to remain silent or requested an attorney. Sergeant Martin further testified that the defendant was never threatened, coerced, deprived of food or water, tortured, or abused in any way. Sergeant Martin testified that the entire interview lasted less than two hours. At the conclusion of that interview, the defendant dictated and signed the confession that was later introduced as evidence against him at trial.

The defendant did not take the stand during the suppression hearing. Consequently, the unrebutted testimony in the record supports the trial court's finding that the defendant's confession was freely and voluntarily given. While the defendant later testified at trial concerning his interrogation in a manner that might have supported a potential Fifth Amendment claim on grounds that his confession had been coerced, this testimony came long after the court's ruling on the pretrial suppression motion and after his confession had been admitted into evidence during the prosecution's case-in-chief. For whatever reason, this defendant apparently made the choice that testifying at the suppression hearing was not in his best interests, and the law respects his right to make that choice. With only the State's evidence before the trial court at the appropriate time, it is clear that the record evidence amply supports the trial court's determination that there was no violation of the defendant's constitutional rights during his interrogation. Therefore, the defendant's claim on this issue must be denied.

III.

The defendant next argues that he is entitled to a new trial because of prosecutorial misconduct. In this regard, he draws our attention to: (1) the prosecutor's questioning of the victim concerning whether anyone had used her stolen credit cards in the days following the robbery; (2) the prosecutor's act of placing an assistant prosecutor on the stand and questioning her regarding the victim's act of identifying the defendant at a preliminary hearing; and (3) the prosecutor's reference at closing argument to a defense witness going "off-script" during his testimony.

Trial courts have broad discretion concerning the admissibility of evidence, *see State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006), and in controlling the course of arguments, *see State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001), and will not be reversed in these matters absent some showing that their discretion has been abused. "Moreover, prosecutorial

misconduct does not amount to reversible error absent a showing that it has affected the outcome [of the trial] to the prejudice of the defendant." *Bane*, 57 S.W.3d at 425. None of the conduct complained of by the defendant suffices to meet these strict standards.

The defendant's first source of complaint is that during the course of the victim's testimony at trial, the prosecutor asked the victim if she had given police any evidence that the defendant had used her stolen credit card in the days following the robbery. The victim started to answer yes, but defense counsel objected, and a bench conference ensued following a brief additional colloquy. Following that conference, the prosecutor informed the witness that there would be no additional discussion of "credit card stuff," and her testimony went off in a different direction. The defendant claims that this line of questioning was an improper attempt on the part of the prosecution to imply to the jury that the prosecution was in possession of evidence that it did not have, *viz.*, that the defendant had used the victim's credit card after the robbery.

We have previously held that both (1) intentionally misstating the evidence and (2) arguing or referring to outside facts may constitute prosecutorial misconduct. *State v. Goltz*, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003). However, we do not believe that the record in this case establishes that the prosecutor, in asking the questions at issue, was committing either of these impermissible acts. Rather, it appears to us that the prosecutor was merely attempting to introduce evidence that he deemed might be helpful to his case but was prevented from doing so by a timely defense objection. In the course of the prosecutor's attempts to elicit the sought-after testimony and the defense's ensuing objection, the witness managed to utter one or two phrases that would ideally not have been uttered, but this does not appear to us to be the prosecutor's fault. Rather, he appears to have done his best to instruct the witness at the appropriate time and in the appropriate way not to discuss anything pertaining to the subject matter of the defense's objection (*i.e.* the use of her credit cards). We concur with the State's assessment that this testimony and the exchanges surrounding it would have, at most, served to confuse the jury rather than prejudice it against the defendant.

However, we view with some concern the actions forming the subject matter of the defendant's second complaint – the prosecutor's decision to call Marlinee Iverson, the same assistant district attorney who represented the State at the defendant's preliminary hearing in general sessions court, to the stand as a fact witness to testify concerning the victim's in-court identification of the defendant at that hearing. The trial prosecutor engaged in further puzzling behavior by asking this (and other) witnesses seemingly irrelevant questions on subjects such as his prowess as a marathon runner – antics that fall quite flat - and do not reflect creditably on the State when viewed on a cold record on appeal.

It is well established that it is improper for a prosecutor to personally vouch for the

credibility of any witness. *See, e.g., Goltz*, 111 S.W.3d at 6 ("It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."). This court is unlikely to countenance any attempt by the State to avoid this rule by switching prosecuting attorneys partway through a case and converting a former prosecuting attorney into a fact witness solely for the purpose of bolstering the credibility of one of its witnesses. The prosecutor's decision to call the attorney responsible for conducting the defendant's preliminary hearing as a fact witness in this case is especially puzzling given that the courtroom on the day in question must have been populated by numerous other persons who could have served equally well as fact witnesses, without running the risk of creating an appearance of impropriety.

However, the defendant failed to object to Ms. Iverson's testimony at trial and, therefore, has waived this issue. *See State v. Thomas*, 818 S.W.2d 350, 364 (Tenn. Crim. App. 1991), *perm. to appeal denied* (Tenn. Sept. 9, 1991) ("The failure to make a contemporaneous objection serves as a waiver."). While Tennessee Rule of Appellate Procedure 36(b) allows us to engage in "plain error" review of an otherwise waived issue under certain circumstances, such review requires us to determine that, *inter alia*, "a clear and unequivocal rule of law [has] been breached" *State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (internal quotation omitted). There is, at present, no clear and unequivocal rule of law prohibiting an attorney who was previously responsible for prosecuting a case from later acting as a fact witness at the defendant's trial under the proper circumstances. Moreover, the witness in this case testified only to the factual events that transpired at the preliminary hearing and, while she stated that the victim "made her identification, immediately," she did not express any opinion as to the accuracy of that identification. Consequently, while certainly troubling, the present law does not clearly and unambiguously prohibit this type of testimony.

Moreover, this court will only engage in plain error review where "substantial justice is at stake; that is, the error was so significant that it probably changed the outcome of the trial." *Id*. (internal quotation omitted). We are far from convinced on this record that it was the admission of Ms. Iverson's testimony that led to the defendant's conviction in this case. Ms. Iverson's former role in prosecuting the defendant was made plain to the jury during her testimony, and the jury could hardly have deemed her an unbiased source of information. More important, it was made plain to the jury that the identification made by the victim at the preliminary hearing was not done out of a full lineup consisting of a cohort selected for their similarity to the defendant in terms of racial and other features. This contrasts with the evidence and testimony concerning the victim's photo lineup identification of the defendant, in which the victim identified the defendant out of a group of at least somewhat similar-looking individuals. Consequently, the identification made by the victim at the preliminary hearing was, at its heart, simply cumulative and constituted less compelling evidence than

-10-

the identification of the defendant made by the victim both from the photo lineup and when she took the stand at trial. It was almost certainly these two identifications, combined with the defendant's own confession to the robbery, that resulted in his conviction. Because the defendant has failed to show any prejudice resulting from the admission of Ms. Iverson's testimony, we will await a more proper occasion to address the various issues surrounding the use of a former prosecuting attorney as a fact witness at the same defendant's trial.

Finally, the defendant complains that the prosecutor made improper statements in his closing argument to the effect that a certain defense witness had "stuck to the script that was given to him" before going "off the script" at some point. This argument has also been waived by the defendant's failure to object at trial. *See Thomas*, 818 S.W.2d at 364. This court declines to engage in plain error review of the issue because (1) no clear and unequivocal rule of law has been breached by the admission of these statements, which appear to us to merely have been colorful figures of speech used to imply that the defense witnesses' credibility was suspect (because their stories were too similar to have been unrehearsed), and (2) in light of the considerable evidence against him including the victim's eyewitness testimony and his own confession, the defendant has failed to show that the challenged statements affected the outcome of his trial. *See State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000).

IV.

Finally, the defendant argues that his fifteen-year sentence for the crime in question was excessive. However, this sentence is within the range prescribed by the legislature for the offense at issue. A review of the record reveals that the trial court considered all of the appropriate sentencing considerations before rendering its decision. Consequently, we decline to disturb the decision below.

"The burden of demonstrating that a sentence is erroneous is [placed] upon the party appealing." *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2008). So long as the trial court considered the proper sentencing principles and all relevant facts and circumstances when it imposed the sentence, this court will presume that the sentencing court's determinations are correct. *Id.* at 344-45. The "weighing of various mitigating and enhancing factors [is] left to the trial court's sound discretion." *Id.* at 345. If the findings of fact made by the sentencing court are adequately supported by the record, we will affirm the imposed sentence regardless of whether or not we agree with the result. *State v. Goodwin*, 143 S.W.3d 771, 783 (Tenn. 2004); *State v. Pike*, 978 S.W.3d 904, 926-27 (Tenn. 1998).

Here, the trial court appears to have followed proper Sentencing Act procedure and applied all of the sentencing factors appropriately. The defendant argued that he should be

granted especially mitigated offender status, which may be granted by a court if "the defendant has no prior felony convictions" and "the court finds mitigating, but no enhancement factors." T.C.A. § 40-35-109(a) (2011). The court found both conditions applicable to the defendant but declined to sentence him as an especially mitigated offender in light of (1) the violent nature of the defendant's crime and (2) the defendant's lack of candor before the court as well as his apparent unwillingness to recognize the serious consequences of his actions. The record reflects that the trial court heard the relevant evidence, considered all the applicable circumstances, and imposed a sentence that was permissible in light of the applicable sentencing law and the particular circumstances of the crime. Consequently, we are compelled by precedent to decline the defendant's invitation to disturb the trial court's decision on appeal.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE