IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 11, 2015

## STATE OF TENNESSEE v. OTIS QUIRINO LOYOLA, SR.

**Appeal from the Circuit Court for Montgomery County
No. 41201263     John H. Gasaway, III, Judge**

---

**No. M2014-01621-CCA-R3-CD – Filed May 18, 2015**

---

The defendant, Otis Quirino Loyola, Sr., appeals his Montgomery County Circuit Court convictions of aggravated child neglect and aggravated child abuse which resulted in an effective 20-year sentence to confinement. On appeal, the defendant challenges the sufficiency of the convicting evidence of aggravated child abuse and aggravated child neglect. Following our review, we affirm the judgments of the circuit court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Eric J. Yow, Clarksville, Tennessee, for the appellant, Otis Quirino Loyola, Sr.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General (Senior Counsel); John Wesley Carney, Jr., District Attorney General; and Kimberly Lund, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The indictment charged the defendant and his wife, co-defendant Penselynn Loyola, with one count each of the aggravated neglect and of the aggravated abuse of O.L., their infant son, who sustained significant, permanent injuries and debilities. Following a joint January 2014 bench trial, the trial court entered judgments of conviction against the defendant on both counts and imposed an effective sentence of 20 years to serve in the department of correction. Ms. Loyola, the co-defendant, was convicted of aggravated child neglect.

The evidence at trial showed that the victim was about five weeks old at the

time the offenses were committed in December 2011. The victim's eight-year-old sister testified that the defendant, who is her stepfather, hit the victim with a "flat" hand when the victim was in the defendant's lap. She testified that the assault occurred in her parents' bedroom and that the defendant was sitting on the bed. She said the assault caused the victim to cry.

Tyler Barrett, a child advocacy detective with the Clarksville Police Department ("CPD"), testified that he went to Vanderbilt Children's Hospital on December 19, 2011, in response to a call regarding an infant with a life-threatening injury. Upon arriving at the hospital, Detective Barrett learned that the victim had "a lot of swelling to the brain" and "some broken ribs on one side." The detective was unable to locate or contact the victim's parents. A few hours after Detective Barrett left the hospital, he learned that the victim's parents were at the hospital, and the detective returned to the hospital.

In an interview with the detective, the defendant said that the injuries to the victim may have been caused by the couple's two-year-old sibling trying to lift the infant victim; the defendant previously had seen the two-year-old attempting to lift the infant. The detective testified that the defendant interspersed laughter amid his description of the two-year-old's attempts to lift the victim. The defendant said that his wife was the usual care-giver for the children. The detective exhibited to his testimony photographs he took of the victim in the hospital. Another CPD officer testified that in December 2011, 12 steps and a landing separated the ground floor from the upper level of the defendant's apartment and that the apartment was very clean.

CPD officer DeMone Chestnut testified that, during an interview with the defendant, the defendant denied causing the victim's injuries. The defendant told the officer that "he just goes to work" and is "not active in the raising of the kids." Officer Chestnut said that the defendant's wife also denied causing the victim's injuries but admitted that she could have done so accidentally. The defendant's wife said that more than once she had dropped the victim in the bathtub while bathing him, that at least once he had fallen down the apartment stairs, and that the two-year-old had once struck the victim with a remote control device. Ms. Loyola told the officer that two of these incidents may have occurred on Thanksgiving weekend, 2011, when the victim was about nine days old. The officer mentioned that the child had seen a doctor on December 5, 2011, and that no injuries were evident at that time.

On cross-examination, Officer Chestnut agreed that his investigation revealed that Ms. Loyola typically performed all of the childcare functions in the household, that the defendant was away from the home working on a daily basis from about 5:00 a.m. until 5:00 or 6:00 p.m., and that Ms. Loyola did not tell the defendant

about the accidents. The officer stated that payday was a major event for the family because the defendant would take them shopping. The payday following the December 5, 2011 well-baby doctor visit was December 15, 2011. Officer Chestnut agreed that the following weekend fell on December 17 through 18, that the defendant was not working that weekend, and that the injured victim went to the hospital on December 19.

Laura Anderson, a pediatric social worker at Vanderbilt Children's Hospital, testified that she met the victim's parents when they arrived at the hospital after the victim had been admitted. She described them as "real quiet, didn't ask a lot, you know." She spoke with them again after Doctor Deborah Lowen had talked with them, and the defendant commented that Doctor Lowen was "so smart" in "that she figured out that someone had hurt the baby."

Doctor Lowen, director of the center for child protection and well-being at Vanderbilt Children's Hospital, was accepted as an expert "in pediatric child abuse" and presented extensive testimony. She testified that, when the victim entered the hospital on December 19, 2011, he was five weeks old and was "very, very sick, very critically ill." Doctor Lowen then spoke with the defendant, who told her that the victim began showing symptoms such as declining to eat and difficulty breathing on Saturday, December 17. Doctor Lowen testified that the defendant told her that he and his wife considered taking the victim to the hospital on Saturday, December 17, but decided against doing so and that the child mostly slept on Sunday.

Doctor Lowen testified that she had difficulty getting a detailed time line of the baby's symptoms from the defendant because some of his answers were not on point or were confusing. Doctor Lowen said she had a difficult time getting the defendant to understand that the victim had a serious brain injury that could be fatal. She testified that the defendant told her that he believed that the victim "was not right since birth, that there was something wrong with [the victim] from when he was born and that this was solely a manifestation, a sign of – that something was wrong with his baby."

Doctor Lowen recalled that Ms. Loyola told the doctor that the victim had been sick "since the week prior." She said the victim was "not latching on and breast feeding well at all." The doctor said that both parents denied any accidents with the victim such as the victim's being dropped.

Doctor Lowen was concerned about the lack of promptness in having the child treated. She said that the victim exhibited "no tone," was "very floppy," and "had respiratory problems" that required the use of a breathing machine. The child's left eye was "not reactive," and the pupil in that eye was dilated. She testified that the victim's lack of reactivity would have been obvious to a care-giver. In reviewing the radiological

scans, Doctor Lowen noticed a skull fracture and some fractures of ribs "one through four or six" on the victim's left side. She testified that the victim was "thin" and that his "head looked too big for his body." Doctor Lowen stated the victim's weight on December 19 was very close to his birth weight, and he had lost weight since his 20-day checkup on December 5. The fontanel, the soft spot in the top of an infant's head, was "bulging outward," and the lines between the bony plates of the infant's skull were separated. She testified that she "could feel where the skull fracture was" although no swelling was present at the fracture location. Doctor Lowen explained that the lack of swelling around the skull fracture indicated that the fracture was not "brand new."

Doctor Lowen testified she diagnosed the victim as having sustained "child physical abuse." She was "less clear" about whether an older brain injury – manifested in the disappearance of brain material – was the result of either neglect or abuse. She opined that the rib fractures required a squeezing pressure from the victim's front to his back. She stated, "These fractures are highly associated with abuse in the absence of a clear accidental history of that type of mechanism."

The doctor testified that on December 20 she detected swelling of the victim's right knee. After obtaining x-rays, she found fractures of the "bottom end of his right thigh bone and the top end of his right shin bone." She described these injuries as "corner fractures" that "occur when an extremity is yanked, pulled, or twisted." The doctor denied that the treatment and diagnosis procedures at Vanderbilt could have caused these injuries.

Doctor Lowen reviewed the victim's birth records and found no indication of any event that would have resulted in the head and brain injury, but she testified that some anomalies occurred. She said that, first, the victim's umbilical cord was wrapped tightly around his neck at birth, causing the obstetrician to cut the cord so as to facilitate the delivery of the rest of the victim's body. Second, the victim had passed a "little baby stool" before birth, and when that happens, the fetus can inhale some of that material, causing lung problems upon the baby's taking his first large breath of air; the situation calls for suction of the airway before that breath is taken. This was done in the victim's case; however, postponement of the first breath of air resulted in the need to "jumpstart" his breathing. Doctor Lowen said that, according to the birth records, once the victim's breathing was jumpstarted, "he was fine, pinked up, heart rate was fine the whole entire time and he was fine enough that they didn't even take him to the newborn nursery, they left him with Mom and the OB nurse." Doctor Lowen opined that it was "very unlikely" that a combination of these anomalies could have caused the victim's brain injury. She said he would have been "neurologically abnormal," and the obstetrical personnel would have noticed.

-4-

The doctor opined that the newer brain injury – the injury resulting in the swelling of the fontanel – was the result of abuse that occurred within the week preceding the victim's hospital admission. She opined that the history of the victim's being ill for three days would be consistent with the occurrence of the newer brain injury.

Doctor Lowen testified that the brain injuries had caused neurodevelopmental delays and that the victim would never be "'normal'" in a "developmental way." She stated that she recently had observed the victim, age two at the time of trial, and that he was not performing the normal functions of a two-year-old. He is mostly blind because "the areas of the brain that process his vision no longer are there." The victim has a seizure disorder and is fed "via a G tube, a tube in his stomach." She said the victim cannot "roll from his back to this tummy and he cannot sit independently, he cannot feed himself at all." She noted he requires "total care" but "does smile," "laughs a little bit," and "likes to be touched." The doctor described his deficits as basically permanent, stating that the victim "will never walk."

Doctor Lowen opined that the skull fracture resulted from a single blow, that one of the rib fractures may have been newer than the others, and that the leg fractures occurred at a different time than the rib fractures. The doctor believed that dropping the victim or striking him with a remote control device would not have caused the "totality" of injuries. She stated that the injuries will ultimately cause the victim's death from pneumonia or infection resulting from pneumonia or from "unrelenting seizures."

Doctor Lowen further opined that, in addition to the injuries sustained by the victim, he had also been neglected. On cross-examination, Doctor Lowen explained a reference to "two areas of old infarc" in her report and said that the "infarcs" are areas of the brain that died through insult that could have been sustained before or during delivery. She referred to these "infarcs" as the old brain injuries which, later in her testimony, she described as "large but . . . in two focal areas of the brain." She denied that the skull fracture happened at birth. She said that the child's weight gain as recorded at his 20-day checkup was normal. She testified that, in the last couple of days before his hospital admission, the victim's symptoms would have been obvious and that, whenever the skull fracture occurred, the resulting swelling would also have been obvious to a care-giver. She testified further that the date of the skull fracture was difficult to determine. Doctor Lowen denied that the impact that caused the fracture was necessarily the cause of the victim's most serious brain injury, which she characterized as the "newer" injury. She opined that dropping the victim in the shower could cause a "very localized brain injury" and perhaps a skull fracture but would not cause the type of extensive injury found in the victim's brain. Doctor Lowen clarified that the "newer" brain injury caused the significant damage; that injury was "widespread and extensive." Based on the areas

of the brain affected by the older injuries, those injuries did not cause the victim's blindness or his difficulty eating.

Doctor Lowen testified she performed no testing for genetic etiology because "no genetic condition . . . causes this compilation of injuries." On redirect examination, Doctor Lowen testified that a slap to the side of the victim's head could not have caused the "severe brain injury [the victim] came in with." She clarified that an impact of some type caused the skull fracture but that the "extensive brain injury" could have been caused by an impact or by "violent shaking." The rib and leg fractures were "outside that of normal caretaking or caregiving."

After the State rested its case, Ms. Loyola testified that despite feeding the newborn victim breast milk and formula, he did not gain weight and was skinny with "his head swollen big" when he went for his 20-day examination.[1] She said that she told the defendant in November that the victim was sick. Ultimately, she told the defendant to take the victim to the hospital; she had no driver's license and no telephone.

The co-defendant testified that she witnessed the defendant's slap of the victim as described by her other child earlier in the trial. She added, "[H]e slap and then he punch." She said that she had lied when she told an officer that she had dropped the victim in the bathtub and on the stairs. She denied that she caused any injury to the victim. She stated that the defendant began hitting the victim in November. She described the defendant's treatment of the victim when the victim would not stop crying: "He just pick up and then slap hard, so hard and then he punch him and then he pinch him, drop bed and pinch again and slap and punch." She testified that she did not report the assaults because the defendant "tell me don't say anything." She said that the defendant hit the victim on the weekend before the victim was taken to Vanderbilt.

The co-defendant agreed that she originally told the police that the defendant had not injured the victim and that, before suggesting that the injuries resulted from an accident, she did not know how the victim sustained his injuries. She testified that her earlier statements were the result of the defendant's telling her what not to say. She agreed that she had not come forward with the version that the defendant caused the injuries for more than two years and only did so a few weeks before trial. She admitted that she and her attorney went to the prosecutor's office with this later version of events because she was told that she might get a resolution of her case that would be more acceptable than going to trial.

---

[1] Ms. Loyola's native language was described as "Micronesian," and she testified with the assistance of an interpreter.

The co-defendant testified that she performed all of the household and childcare chores. She said that on weekends and in the evenings when the defendant came home from work, he spent most of his time playing video games.

The defendant testified that he did not harm the victim. He said he was typically away from home attending to his military job from 4:00 a.m. until 5:00 p.m. or later on weekdays and sometimes on Saturdays. He said that his wife maintained an immaculate household and that she provided the childcare.

The defendant testified that over the weekend of December 17 and 18, 2011, he noticed that the victim felt warm to the touch and thought that the victim might have influenza. The defendant said this prompted him to take the victim to the hospital. He did not know the child had been injured and had not suspected illness before December 17. He denied that his wife told him to take the victim to the hospital. On Monday morning December 19, he noticed the victim's "making noise when he was trying to breathe."

The defendant denied telling Ms. Loyola to claim responsibility for the victim's injuries. The defendant testified that, during questioning by the police and the doctor, he did not initially understand that anything was seriously wrong with the victim, who he thought had contracted influenza. He agreed he may have laughed during the conversations but that, if so, it would have been because he thought the idea of the victim's being injured was "ridiculous." He opined that the descriptions of his laughing had been exaggerated.

The defendant denied squeezing the victim's ribs, jerking him around by his leg, suspending him in the air by his legs, hitting him with an open or closed hand, pinching him, or doing anything else "intentionally or accidentally" to injure the victim. He testified that, on one occasion, he saw the co-defendant smack the victim on the lips because he was crying, although at the time he did not think it was "anything serious." He said he did not interrupt his video game on that occasion to check on the victim's crying but yelled for his wife, adding, "[t]o my understanding, she knows how to take care of the kids more than me." He said that the children's crying made him sad but not angry.

The defendant said that he did not notice anything "out of the ordinary" with the victim's head on the weekend of December 17 and 18, 2011. He knew, however, that the victim was not eating properly. He denied that the co-defendant told him in November 2011 that the victim's head was swollen and that he needed medical attention.

The defendant had seen the couple's two-year-old child in the crib with the victim, but the co-defendant told him that the two-year-old had hit the victim with the video controller. He said that he heard from the police about the co-defendant's statements about dropping the victim and that the co-defendant had never told him this. He stated, "I love my kids . . . . I would not hit my kids in a way – you know, like in a crazy way where to injure, it's just – it don't even make sense, that's not me."

The defendant agreed that he filed for divorce after the co-defendant was arrested, but he withdrew the divorce action because he could not financially afford to pursue it.

The trial court convicted the defendant of aggravated child neglect and aggravated child abuse and imposed incarcerative, concurrent Range I sentences of 15 years and 20 years respectively. The court overruled the defendant's timely motion for new trial, and the defendant filed a timely notice of appeal.

In his first issue, the defendant claims that the evidence is insufficient to support his conviction of aggravated child abuse in violation of Code section 39-15-402(a)(1).[2] When an accused challenges the sufficiency of the evidence, the appellate court considers the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), regardless whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence, *State v. Winters*, 137 S.W.3d 641, 654-55 (Tenn. Crim. App. 2003). Especially inimical to the defendant's claim is the well-rooted axiom that the appellate court neither re-weighs the evidence nor substitutes its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Also, the credibility of the witnesses, the weight and value of the evidence, and all other factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). The appellate court affords the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

At the time of the offenses in the present case the proscriptive statutes for aggravated child abuse provided as follows:

---

[2] The defendant's brief is unclear whether he is challenging both convictions or only the convictions of aggravated child abuse rooted in Code section 39-15-401(a). We will review both convictions.

Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony.

T.C.A. § 39-15-401(a) (Supp. 2011).

A person commits the offense of aggravated child abuse, aggravated child neglect or aggravated child endangerment, who commits child abuse, as defined in § 39-15-401(a) . . . and:

(1) The act of abuse results in serious bodily injury to the child . . . .

*Id.* § 39-15-402(a) (Supp. 2011).

The defendant posits that the co-defendant admitted pretrial that she had dropped the victim on at least two occasions and that her negligence, as admitted, was consonant with the injuries sustained by the victim. The defendant emphasizes that his denial of responsibility for the injuries remained constant throughout the pendency of the trial proceedings. He maintains that the co-defendant's recantation of her pretrial statements came virtually on the eve of trial and was prompted by her desire to obtain a favorable plea offer. He says her resulting testimony that her pretrial statements were false is not worthy of belief. He argues that his version of events remained consistent although hers was "self-contradicting." Essentially, then, the defendant challenges the co-defendant's credibility.

These types of cases, wherein the trier of fact could have believed either of two conflicting accounts of the charged crimes, underscore the importance in our judicial system of a defendant's "day in court" because, when the evidence favoring the prosecution supports a finding of the elements of the offense, the appellate court reviewing the case must defer to the fact-finder's determinations of fact and credibility. *See Cabbage*, 571 S.W.2d at 835; *Winters*, 137 S.W.3d at 654-55. We have long been committed to this policy of deference because to do otherwise would be to circumvent the trial process as the crucible for discerning truth. In the present case, the State's evidence established the elements of aggravated child abuse, and the trial court not only accredited this evidence but obviously discredited the defendant's testimony. Accordingly, the evidence legally supports the judgments of the trial court.

In a somewhat conclusory fashion, the defendant states in his brief that the convictions are based upon the uncorroborated testimony of an accomplice. Certainly, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the trier of fact. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts*, 379 S.W.2d at 43).

The present case was bench-tried, obviating any necessity for jury instructions about the issue of corroboration or the status of the co-defendant as an

accomplice. Next, we discern that even if the trial court should have viewed the co-defendant as an accomplice to the defendant's commission of aggravated child abuse and aggravated child neglect, her testimony about the abuse was corroborated by the testimony of the eight-year-old sibling, and the co-defendant's testimony about the neglect was corroborated by Doctor Lowen who established the visible nature of the victim's symptoms and the failure of the defendant to seek timely medical attention. Consequently, the claim of lack of corroboration is unavailing.

As a result of our analysis, we affirm the judgments of conviction of aggravated child abuse and aggravated child neglect.

_____
JAMES CURWOOD WITT, JR., JUDGE